Donald THIGPEN, Petitioner–Appellant,

v.

Morris THIGPEN, Commissioner, Alabama Department of Corrections, Willie D. Johnson, Warden, Holman Unit, Respondents–Appellees.

No. 89–7368.

United States Court of Appeals, Eleventh Circuit.

Feb. 26, 1991.

Rehearing and Rehearing En Banc Denied April 29, 1991.

John Charles Boger, Steven Wayne Hawkins, Steven A. Reiss, New York University School of Law, New York City, for petitioner-appellant.

Ed Carnes, Asst. Atty. Gen., Montgomery, Ala., for respondents-appellees.

Before TJOFLAT, Chief Judge, ANDERSON and COX, Circuit Judges.

TJOFLAT, Chief Judge:

Donald Thigpen appeals from the district court's refusal to grant a writ of habeas corpus, pursuant to 28 U.S.C. § 2254 (1988), setting aside his conviction. Thigpen was convicted of first-degree murder by an Alabama court and sentenced to death under Ala.Code § 13–1–75 (1975) (repealed 1980), which established a mandatory death penalty for those who committed first-degree murder while serving life sentences.[1] After exhausting his remedies in state court,[2] Thigpen petitioned the district court for a writ of habeas corpus, alleging several constitutional defects in his conviction and sentence.[3] The district court set aside his death sentence, finding that section 13–1–75 was unconstitutional under *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), but upheld his conviction.[4] On appeal, Thigpen raises only one issue: whether the admission of evidence that he was convicted in 1972 of another first-degree murder and received a death sentence, which was later reduced to life in prison, rendered his trial so fundamentally unfair that he was convicted without the due process of law.[5] For the reasons set forth below, we affirm the district

court's conclusion that Thigpen's conviction was constitutional.

We organize this opinion as follows. In part I, we outline the facts and discuss the evidence presented at Thigpen's trial. In part II, we describe the district court's conclusion that Thigpen's conviction was valid and present the parties' claims on appeal. In part III, we conclude that the admission of the disputed evidence did not render Thigpen's trial fundamentally unfair.

I.

On May 5, 1972, an Alabama jury convicted Thigpen of the first-degree murder of Cassie Davis; he was sentenced to death. On appeal, the Alabama Court of Criminal Appeals reduced his death sentence to life in prison, pursuant to *Hubbard v. State*, 290 Ala. 118, 274 So.2d 298, 300 (1973), which declared Alabama's general death penalty statute unconstitutional under *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *See Thigpen v. State*, 50 Ala.App. 176, 277 So.2d 922, 925–26 (Ala.Crim.App.1973).

On April 16, 1975, while Thigpen was serving this life sentence, he and several other prisoners escaped from the William C. Holman Prison, a maximum-security fa-

1. Section 13–1–75 states: "Any convict sentenced to imprisonment for life, who commits murder in the first degree, while such sentence remains in force against him, shall, on conviction, suffer death." Ala.Code § 13–1–75.

 Section 13–1–75 was once codified at Ala.Code tit. 14, § 319 (1940) (recodified 1958); the state and district court opinions in this case cite the statute as such and call it "section 319."

2. Thigpen first unsuccessfully appealed his conviction and sentence. *Thigpen v. State*, 355 So.2d 392 (Ala.Crim.App.), *aff'd*, 355 So.2d 400 (Ala.1977). He then sought state collateral review by filing a petition for a writ of error coram nobis; the Alabama courts, after an evidentiary hearing, denied his petition. *Thigpen v. State*, 374 So.2d 401 (Ala.Crim.App.), *cert. denied*, 374 So.2d 406 (Ala.1979).

3. In our earlier decision in this matter, *Thigpen v. Smith*, 792 F.2d 1507 (11th Cir.1986), we vacated a decision of the district court, *Thigpen v. Smith*, 603 F.Supp. 1519 (S.D.Ala.1985), which, pursuant to a stipulation by the parties, resolved only one of Thigpen's challenges to his

conviction and sentence and dismissed his other claims with leave to refile. We held that the district court had erred by allowing the parties to circumvent the successive petition rule when they agreed to litigate Thigpen's challenges in a "piecemeal fashion"; accordingly, we remanded the case, instructing the district court to consider all of Thigpen's challenges. *Id.* at 1516.

4. The district court also certified a question to the Alabama Supreme Court: whether, under Alabama law, Thigpen could be resentenced to death in a new sentencing hearing, or whether his death sentence should be reduced to life in prison. In response, the Alabama court held that Thigpen could not be resentenced to death, because Alabama had no constitutional death penalty statute in effect when he committed his offense. *Thigpen v. Thigpen*, 541 So.2d 465, 467 (Ala.1989).

5. Thigpen waived his right to appeal the district court's adverse dispositions of his other challenges to his conviction by not raising them in this appeal.

cility. Early in the morning of April 17, Thigpen and another escapee, Pedro Williams, were walking along a dirt road near the prison when they heard a pickup truck approaching and hid in some bushes. When the driver, an elderly farmer named Henry Lambeth, stopped and began loading fenceposts into the truck, either Thigpen or Williams (or both) attacked Lambeth with an axe or a fencepost and killed him. The two then carried Lambeth's body to an abandoned house nearby and stole the truck. Shortly thereafter, an Alabama state trooper stopped the truck for speeding and took Thigpen and Williams into custody. Thigpen, who was driving when the two were caught, told the arresting officer that he and Williams had stolen the truck from a man who was feeding cows in a field.

After the arrest, Williams, who was serving fifteen years for robbery when he and Thigpen escaped, gave investigators three separate statements describing Lambeth's murder; in all three, Williams stated that Thigpen had killed Lambeth and that he had neither assisted in nor intended the murder. Williams gave the first of these statements to Investigator Marlin Brewer and Warden Barney Hardin at Holman Prison on April 17, a few hours after he was taken into custody. Williams said that Thigpen and another escapee, John Griffin, had left Williams hiding in the woods. They returned approximately half an hour later with blood on their clothes and a pickup truck. They told Williams that they had "jumped an old man and beat him up and ... took the truck." Williams then got into the truck and the three drove away.

According to Williams, Griffin soon got out of the truck because he was frightened that the police would stop the vehicle on the interstate. Because it later became apparent that Griffin was not involved in the crime, he was never indicted.

The next day, April 18, Williams was transferred to Fountain Correctional Center, where he gave a second statement to Brewer. Williams told Brewer that Thigpen, on the morning after the escape, said he wanted to get a car in order to flee the country. When the two walked past a house with two cars outside, Thigpen suggested stealing one of the cars. After Williams warned him that people were likely to be in the house, Thigpen decided to burn the house down. Williams, however, was able to persuade Thigpen to abandon this plan.

After this episode, the two walked along a dirt road. When they heard Lambeth's truck approaching, they hid in some honeysuckle vines. After Lambeth stopped and got out of the truck, leaving the keys inside, they decided to steal it. According to plan, both emerged from the bushes, and Thigpen distracted Lambeth with conversation while Williams got into the truck. Thigpen, however, deviated from their plan: he took an axe from the truck and killed Lambeth. Thigpen told Williams he had to kill Lambeth because he did not want to leave any evidence. They then carried the body—Thigpen holding Lambeth's head and shoulders, Williams holding his feet—to an abandoned house nearby. After this, Williams drove them away in the truck.[6]

---

6. This portion of the April 18 statement read, in pertinent part:

I [Williams] said I think I am going to get that truck because the keys are in it. I went directly to the truck talking. How you all get over here, [Lambeth] said. That don't matter.... [Thigpen] said let me help you load the poles. [Lambeth] said no, that is all right. So I was getting in the truck that time. Thigpen was standing there and saying that. I told Thigpen I said no, man. Thigpen tried to hit him in the foot with the poles or something. He grabbed an axe. It was an axe on the truck.

....

... Thigpen ... grabbed the axe and hit the old man with it. The old man fell down. He told me come on over here ... and help me. I said what you done ...? He said I believe he is dead. Say I got to kill him because I don't want to leave no evidence. He took him. I grabbed him by the legs. As you can see I had him by the foot to help him raise him up through the window [of the house] so I started driving.

....

... [We] pushed him in the window. I see him done kill him. Now I said put more heat on. He said that we couldn't leave no evidence, don't want to go be no evidence.

Williams made a third statement, also at Fountain Prison, to investigators Brewer and James Dixon, on April 21. In yet another version of the facts, Williams stated that he (Williams) had distracted Lambeth by walking around him; when Lambeth turned his back on Thigpen, Thigpen killed him with the axe.

In one of these statements, Williams told Brewer that he had received a letter from Thigpen cautioning him not to talk about the incident. In the letter, Thigpen professed his friendship for Williams, told Williams that the State did not have "anything" on them, advised Williams not to talk to a lawyer unless Thigpen was present, and told Williams to "be cool and live on."[7]

Williams was indicted for first-degree murder. He pled guilty to second-degree murder, pursuant to an agreement with the State, and received a sentence of ninety-nine years in prison before Thigpen was tried. Thigpen was indicted under section 13–1–75, as a person who committed first-degree murder while serving a life sentence.

The primary issues at Thigpen's trial were whether Thigpen killed Lambeth, or, if not, whether Thigpen intended that Williams should kill Lambeth. The State sought to persuade the jury that Williams' post-arrest statements to investigators were true: Thigpen had killed Lambeth with an axe. Alternatively, the State sought to show that even if Williams had killed Lambeth, Thigpen and Williams conspired to murder him and were equally culpable for his death. Thigpen presented another version of the facts, to which both he and Williams testified: Williams had killed Lambeth with a fencepost, and Thigpen had not assisted in or intended the murder.

In its case in chief, the State presented several pieces of physical evidence; each is arguably consistent with both the State's and Thigpen's versions of the murder. First, an axe was found at the scene, approximately thirty feet from a pool of blood on the ground; tests revealed no blood and no identifiable fingerprints on the axe. Second, several fenceposts and a 4– by 4–inch dressed board were found near the pool of blood, and another 4– by 4–inch board was found on the porch of the house; a fingerprint on one of these objects [8] did not match Thigpen's. Third, three hairs, identified as "negroid," were caught on a barbed-wire fence above the pool of blood; Thigpen and Williams are both black. Fourth, type O blood was found on Thigpen's shirt; blood of unascertained type, but of "human origin," was on his pants and undershirt. Lambeth had type O blood; Thigpen has type A.[9] Finally, a pathologist testified that Lambeth had "lacerations" on his scalp and died from blows to his head inflicted with a "blunt-type of instrument."[10]

Also in its case in chief, the State introduced evidence of Thigpen's 1972 conviction for first-degree murder, his death sentence, and the reduction of this sentence to life in prison, to prove that element of the indictment which alleged, pursuant to section 13–1–75, that Thigpen was serving a life sentence when he killed Lambeth. First, the State presented a certified copy of the formal judgment entry showing Thigpen's 1972 conviction and death sentence, with a copy of the Alabama Court of Criminal Appeals decision reducing the sentence to life attached.[11] Thigpen's attorney

---

7. The copy of this letter in the record on appeal is illegible; our summary is taken from the earlier opinion of the district court, *Thigpen,* 603 F.Supp. at 1524.

8. The trial testimony does not reveal which of these objects was tested.

9. Thigpen argues that he got Lambeth's blood on his clothes when he helped Williams carry Lambeth to the abandoned house after Williams killed him. The record does not reveal whether Williams also had blood on his clothing.

10. It can be inferred that the lacerations could have been inflicted with an axe and that the blunt instrument could have been a fencepost.

11. We note that the court of criminal appeals decision, *Thigpen v. State,* 277 So.2d at 922, contains a detailed description of the facts surrounding the 1972 murder. A copy of the decision is not attached to the copy of the formal judgment entry that is in the record in this appeal. The transcript of Thigpen's trial contains no indication that the decision was pub-

objected, arguing that the information about Thigpen's conviction for first-degree murder and death sentence was "highly inflammatory" and would prejudice the jury; accordingly, he offered to stipulate that Thigpen was serving a life sentence at the time he escaped. The court overruled the objection and admitted the judgment entry and decision into evidence.

Second, the State presented the testimony of O.C. Ellard, a police officer involved in the investigation of the 1972 murder, to show that Thigpen had been convicted in 1972 of the crime described in the judgment entry. In examining Ellard on voir dire to determine whether he knew what sentence Thigpen was serving when he escaped, Thigpen's attorney elicited the following response: "I know in '72 he was given the chair." Thigpen's attorney objected, moving the court to strike the entire line of testimony from the record. The court again overruled his objection, allowing the evidence to be provisionally admitted, subject to the condition that the State later "connect it up," i.e., prove its relevance by showing that Thigpen was still serving the 1972 life sentence when he escaped.

Finally, the State "connected up" the earlier evidence: Albert V. Ryer, Director of the Inmate Records Administration, testified that on the date Thigpen escaped, he was "serving ... for Murder, First Degree, life." Thigpen's attorney did not object.

After the State had rested its case, Thigpen called Williams to testify. Williams changed his earlier story: he stated that he, not Thigpen, had killed Lambeth, with a fencepost, not an axe, and that Thigpen neither assisted in nor intended the murder. Williams stated that he and Thigpen were walking along a dirt road in the woods when they heard Lambeth's truck

approaching and hid in the bushes. When Lambeth stopped and began loading fenceposts, Williams came out of this hiding place and approached Lambeth, while Thigpen continued to hide. Williams offered to help Lambeth load fenceposts; Lambeth responded by asking Williams several times "How [did] you get over here?" Williams began helping Lambeth and, when Lambeth turned his back, hit him twice with a post in the back of his head.[12] Thigpen never struck Lambeth, but only approached after Lambeth was unconscious, asking Williams what he had done. They then carried the body—Thigpen holding Lambeth's head and shoulders, Williams holding his feet—to an abandoned house nearby, and left in Lambeth's truck. Williams drove first, then Thigpen took over because Williams was tired.

The State, on cross-examination, impeached Williams' testimony with his prior inconsistent statements of April 18 and April 21; although he admitted making the statements, he stuck to his story and contended that he had made the earlier statements out of fear, to induce the prosecution to let him plead guilty to second-degree murder, and to receive a transfer to another prison where he would be separated from Thigpen. The State also asked him about the letter he received from Thigpen. Williams denied having received the letter and asserted that he was unable to read. He admitted that he had told Brewer before the trial that he had received such a letter, but explained that actually, after telling Brewer about the letter, he had another prisoner forge it.[13]

After Williams testified, Thigpen took the stand and corroborated Williams' story—that Williams killed Lambeth with a fencepost; Thigpen added that he had tried to stop Williams from killing Lambeth.

lished to the jury; we do not know, however, whether the jury had the decision during its deliberations. As neither party raised the issue, we will assume that the jury was not made aware of these details.

**12.** When asked why he hit Lambeth, Williams stated: "He was inquiring about where I was from and how I got over there and he kept inquiring. That is the reason didn't one of us

come out of the woods. I figure both of us, he would have been suspicious about nine men on escape." Williams also said: "I didn't mean to hurt him."

**13.** The letter was admitted into evidence during redirect examination by stipulation of the parties.

According to Thigpen, he and Williams heard Lambeth's truck coming and hid in the bushes. Thigpen told Williams to remain hidden. Williams, contrary to these instructions, approached Lambeth while Thigpen continued to hide. Williams talked with Lambeth, began to help him load fenceposts, and struck him with a post. Thigpen saw Williams strike Lambeth, yelled for him to stop, and attempted to stop the attack. Thigpen, believing that Lambeth was still alive, then helped Williams carry Lambeth to the abandoned house. The two drove off in Lambeth's truck; Williams drove first, then Thigpen took over because Williams was driving erratically.

On the stand, Thigpen admitted that when he escaped from Holman Prison he was serving a life sentence for murder. He also admitted to a prior conviction for grand larceny.

The State, in rebuttal, presented the testimony of Marlin Brewer, the investigator who took Williams' first statement implicating Thigpen and Griffin on April 17. *See supra* p. 1006. Brewer read his synopsis of this statement to the jury.

During closing argument, the prosecutor, without objection, read the judgment entry (disclosing Thigpen's 1972 first-degree murder conviction and death sentence). The prosecutor added that Thigpen's death sentence "was later changed after the ruling of FURMAN against GEORGIA." Thigpen's attorney objected to this remark on the ground that the prosecutor had misrepresented the contents of the judgment entry, as it did not refer to *Furman*.[14]

The judge sustained the objection. Thigpen's attorney, however, did not ask that the statement be stricken from the record or, alternatively, move for a mistrial.

The judge instructed the jury on first-degree murder and informed it that if it found Thigpen guilty of first-degree murder, it was required by section 13-1-75 to sentence him to death. He also instructed the jury on the lesser-included charge of second-degree murder, and on conspiracy or common enterprise.[15] Thigpen asked for and received an instruction that "[t]he law does not countenance the conviction of any person for an offense not contemplated, intended, or committed by him, and of which he had no knowledge that the offense was about to be committed."

Thigpen also requested and received a limiting instruction on the use of his prior convictions: "I charge you that you are to judge the guilt or innocence of the Defendant on the basis of the evidence presented in this case, and that the prior convictions of the Defendant have no bearing on the Defendant's guilt or innocence of the charge now against him." Finally, the judge instructed the jury that a witness could be impeached with prior inconsistent statements and told it not to take the prior inconsistent statements as true, but to weigh them in deciding whether to believe the witness.[16] The jury found Thigpen guilty of first-degree murder and sentenced him to death.

## II.

In his habeas corpus petition, Thigpen argued that the admission of his 1972 conviction and sentences (both the death sentence and the subsequently-imposed life

---

**14.** Thigpen's attorney stated: "I object to that. Nothing in here that they changed it by the ruling except they changed it."

**15.** This jury instruction read, in pertinent part: When by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a co-conspirator, each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not.

**16.** This jury instruction read:

I instruct you that in the instances where the attorneys for either the Defendant or for the State of Alabama have examined any witness as to an alleged statement made prior to the witness' testimony in this trial, and you find this statement to be inconsistent with the testimony given by the witness at this trial, you shall not consider the previous inconsistent statement as evidence that the facts contained therein are true. However, you may weigh the prior inconsistent statement in arriving at your decision whether or not to believe the witness'[ ] trial testimony.

sentence) rendered his trial fundamentally unfair; as a result, he was convicted without the due process of law guaranteed by the fourteenth amendment. The district court rejected this argument. It held, first, that the admission of Thigpen's life sentence was proper, because the life sentence was a necessary element of the State's case under section 13–1–75. It then found that the *manner* in which the State proved this necessary element, by introducing the judgment entry [17] showing Thigpen's prior conviction and death sentence, did not render the trial fundamentally unfair under this circuit's standard in *Shaw v. Boney:* although the evidence may have been prejudicial, it was not "material in the sense of a crucial, critical, highly significant factor." 695 F.2d 528, 530 (11th Cir.1983) (quoting *Hills v. Henderson,* 529 F.2d 397, 401 (5th Cir.), *cert. denied,* 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976)).

On appeal, Thigpen asserts that this court should reverse the decision of the district court for two reasons. First, he argues that because section 13–1–75's mandatory death penalty is unconstitutional, the trial court had no legitimate reason for admitting evidence relating to the 1972 conviction, and the erroneous admission of this evidence rendered the trial fundamentally unfair.

---

**17.** Thigpen argued to the district court that the trial court improperly allowed the jury to hear evidence of his prior conviction and death sentence in three ways: through the admission of the judgment entry and attached opinion, *see supra* p. 1007, through witness Ellard's remark that Thigpen "got the chair," *see supra* p. 1008, and through the prosecutor's remark in closing argument that Thigpen's death sentence had been reduced because of the *Furman* decision, *see supra* p. 1009. The district court found that claims based on the latter two instances were procedurally barred, and Thigpen showed neither cause nor prejudice, under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), to justify a hearing on the merits of these claims.

We affirm the district court's conclusion that Thigpen procedurally defaulted his claims of constitutional error based on witness Ellard's remark and the prosecutor's reference to *Furman,* and that he showed neither cause nor prejudice. On direct appeal from his conviction to the Alabama courts, Thigpen complained only that the *State* had asked Ellard about Thigpen's *prior conviction;* he did not ask the court to reverse his conviction because of Ellard's remark (elicited by the defense) that Thigpen "got the chair." This failure to raise the claim on direct appeal was a procedural default under Alabama law. *See Pelmer v. White,* 877 F.2d 1518, 1521 (11th Cir.1989) (per curiam); *Ladd v. Jones,* 864 F.2d 108, 109 (11th Cir.) ("Under Alabama law, a failure to raise an issue either at trial or on direct appeal from the conviction constitutes a procedural bar to the assertion of the claim in a subsequent collateral proceeding."), *cert. denied,* — U.S. ——, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989); *see also Teague v. Lane,* 489 U.S. 288, 299, 109 S.Ct. 1060, 1068–69, 103 L.Ed.2d 334 (1989) (a claim "never presented to the state courts" is procedurally barred even though no state court has expressly ruled that the claim has been defaulted).

In addition, the Alabama court on direct appeal made a final determination that a claim based on the prosecutor's reference to *Furman* was procedurally defaulted, because Thigpen's attorney did not properly preserve his objection to the remark. *Thigpen,* 355 So.2d at 397. Such a final determination in state court of procedural default is binding on this court absent cause and prejudice. *See Harris v. Reed,* 489 U.S. 255, 262–65, 109 S.Ct. 1038, 1043–44, 103 L.Ed.2d 308 (1989); *Pelmer,* 877 F.2d at 1520. That the Alabama court made an alternate determination on the merits that the reference to *Furman* was not reversible error, *Thigpen,* 355 So.2d at 397, does not authorize us also to consider the merits. *See Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. at 1044 n. 10; *Pelmer,* 877 F.2d at 1520 ("A state court is entitled to express its views on federal constitutional issues without waiving its procedural default rules." (quoting *Hall v. Wainwright,* 733 F.2d 766, 777 (11th Cir.1984), *cert. denied,* 471 U.S. 1107, 105 S.Ct. 2344, 85 L.Ed.2d 858 *and cert. denied,* 471 U.S. 1111, 105 S.Ct. 2346, 85 L.Ed.2d 862 (1985))).

Thigpen argues that even if he procedurally defaulted these claims, we should consider them to show the extent to which the trial was infected with prejudice through the court's initial erroneous admission of the judgment entry. This argument seems to be merely a stratagem to avoid the operation of the procedural default rules. Prejudice alone, without cause, generally will not permit a federal court to hear a procedurally defaulted claim. *See Murray v. Carrier,* 477 U.S. 478, 494, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). We will, however, consider a procedurally defaulted claim in the absence of cause if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent." *Smith v. Murray,* 477 U.S. 527, 537–38, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986) (quoting, respectively, *Engle v. Isaac,* 456 U.S. 107, 135, 102 S.Ct. 1558, 1576, 71 L.Ed.2d 783 (1982), and *Murray,* 477 U.S. at 496, 106 S.Ct. at 2649). This has not occurred in this case.

Second, Thigpen argues that even if the admission of the life sentence was proper under section 13–1–75, the trial court erred in allowing the State to prove the life sentence with prejudicial evidence showing that Thigpen had been convicted of first-degree murder, sentenced to death, and had his sentence reduced to life; the limiting instruction given to the jury was insufficient to cure this prejudice. Moreover, the jury should have heard this evidence, if at all, in a bifurcated sentencing phase of the trial, rather than before it determined whether Thigpen was guilty of Lambeth's murder.

The State responds that we should not judge the admissibility of the evidence by hindsight. Because the Supreme Court had not yet declared death penalty statutes like section 13–1–75 unconstitutional when Thigpen was convicted, the State argues, the trial court properly admitted the evidence of Thigpen's life sentence, and the State was entitled to prove this element of the indictment by introducing the judgment entry during the guilt/innocence phase.[18]

Alternatively, the State argues that even if the evidence was not admissible to prove Thigpen's life sentence under section 13–1–75, it was admissible for two other legitimate purposes; the trial was therefore not fundamentally unfair. First, Thigpen, by testifying, placed his character in issue; evidence of his prior conviction was admissible to impeach his credibility, and the incremental prejudice caused by the jury's knowledge that he had been sentenced to death was insufficient to deprive him of a fair trial. Thigpen responds that he only

chose to testify because the court had already erroneously admitted all of this evidence. Second, the State asserts that the evidence of Thigpen's escape from Holman was admissible as part of the circumstances, or res gestae, of the crime with which he was charged; because the jury knew that Thigpen had escaped from a maximum-security prison and thus could infer that he had received a long sentence for a violent crime, evidence that he had been convicted of murder and sentenced to death added little prejudice.

We do not address these arguments in detail. We find that even if the evidence was not admissible under section 13–1–75 or to impeach Thigpen's testimony, it was nonetheless admissible under Alabama law because it was relevant to Thigpen's motive for killing Lambeth. Since the evidence was relevant and admissible, its introduction could not have rendered Thigpen's trial fundamentally unfair.

### III.

A federal court may grant a state prisoner's petition for a writ of habeas corpus only to correct federal constitutional errors. 28 U.S.C. § 2254(a). We therefore generally will not review a state trial court's decisions on whether to admit evidence and will not grant a writ of habeas corpus simply because a state trial judge has erred, under state law, in this determination. *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir.1989); *Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir.1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *Shaw*, 695 F.2d at

18. The State also argues that Thigpen has either procedurally defaulted (by not raising in state court) or waived (by not raising in the district court) his claim that, because section 13–1–75 was unconstitutional, the admission of this evidence was improper. Thigpen, however, did not waive the claim, because he raised the issue in his habeas petition, when he claimed that

[t]he introduction of evidence concerning petitioner's prior conviction for murder during the guilt or innocence phase of his trial, ostensibly to prove that petitioner had been serving a life sentence at the time of the crime, ... violated petitioner's rights guaranteed by the Eighth and Fourteenth Amendment[s].

Moreover, the Alabama Court of Criminal Appeals addressed the merits of the claim when it found, first, that section 13–1–75 was constitutional, *Thigpen*, 355 So.2d at 395–96, 398–99, and second, that the evidence was admissible as proof of an element of Thigpen's indictment under that section, *id.* at 397. The possibility that Thigpen may have procedurally defaulted the claim by not explicitly raising it on direct appeal, therefore, does not, in this instance, bar us from considering the merits. *See Oliver v. Wainwright*, 795 F.2d 1524, 1528 (11th Cir.1986) (when "a state court has overlooked the possible procedural bar and decided the case on the merits," we may do likewise), *cert. denied*, 480 U.S. 921, 107 S.Ct. 1380, 94 L.Ed.2d 694 (1987).

530 ("we do not sit as a ' "super" state supreme court,' " able to "grant the petitioner relief simply because we believe the trial judge has erred" (quoting *Meyer v. Estelle*, 621 F.2d 769, 771 (5th Cir.1980))); *see also Donnelly v. De Christoforo*, 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

We will grant habeas relief, however, if the admission of the evidence has deprived the petitioner of a federal constitutional right. For instance, if a state trial judge has correctly admitted evidence under state law, but this application of the state rule violated a specific federal constitutional right, we will grant the writ. *See Burgett v. Texas*, 389 U.S. 109, 113–14, 88 S.Ct. 258, 261, 19 L.Ed.2d 319 (1967) (the admission of a prior conviction was constitutional error when the prior conviction had been obtained in violation of the right to counsel; "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution").

Similarly, if a state trial judge erroneously admitted evidence in violation of a state law and the error made the petitioner's trial so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment, we will give habeas relief. *Leverett*, 877 F.2d at 925; *Boykins*, 737 F.2d at 1544; *Shaw*, 695 F.2d at 530. An erroneous evidentiary ruling creates such fundamental unfairness when the wrongfully admitted evidence is "material in the sense of a crucial, critical, highly significant factor." *Leverett*, 877 F.2d at 925; *Shaw*, 695 F.2d at 530 (quoting *Hills*, 529 F.2d at 401). Thus, when a state trial court errs in admit-

ting evidence of an extrinsic offense,[19] but the other evidence of guilt is overwhelming, the defendant is not deprived of a fundamentally fair trial. *See Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989); *Stone v. Green*, 796 F.2d 1366, 1369 (11th Cir.1986) (per curiam).

We therefore will set aside Thigpen's Alabama conviction if the Alabama judge erred, under state law, by admitting the evidence of the 1972 conviction and subsequent sentences, and the evidence was so crucial, critical, and highly significant that its admission rendered Thigpen's trial fundamentally unfair.[20] Our initial inquiry, then, is whether the judge erred, under Alabama law, in admitting the evidence.

We focus on the admission of the judgment entry, as Thigpen has procedurally defaulted his objections to all of the other introductions of the evidence. *See supra* note 17. The judgment entry, which was first introduced as an exhibit and later read to the jury during closing argument, proves each fact to which Thigpen objects: the 1972 conviction, the death sentence, and the reduction of that sentence to life in prison. The most prejudicial information was Thigpen's prior conviction for wilful, malicious, deliberate, and premeditated murder. If evidence of the conviction was admissible, the admission of evidence of the death sentence and its reduction to life added only incremental prejudice. If evidence of the conviction was not admissible, then the trial judge's error deprived Thigpen of due process: the State's case against him was not overwhelming, and the jury likely attached undue importance to the information that he had already been

---

**19.** Thigpen objects to evidence of a prior conviction. Evidence that is admissible to show "bad acts" of the defendant other than the crime for which he is on trial (the "charged crime") is not, however, limited to prior convictions. We use the term "extrinsic offense" to describe all crimes, wrongs, or acts other than the charged crime. *See United States v. Beechum*, 582 F.2d 898, 902 n. 10 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

**20.** Thigpen argues that although the trial court may have correctly applied existing Alabama law in 1976 by admitting the evidence under section 13-1-75, this statute was nonetheless unconstitutional; the admission of the evidence in accordance with it therefore had no legitimate purpose and deprived him of due process. Because we conclude that the evidence was admissible for another legitimate purpose—to show Thigpen's motive for the murder—we do not inquire whether the trial court's *correct* application of an Alabama rule violated one of Thigpen's constitutional rights.

convicted of the most serious of crimes, first-degree murder.

According to the State, this evidence was admissible for two reasons. First, when a statute provides for enhanced punishment because of prior convictions, evidence of a prior conviction is admissible in the guilt/innocence phase of the trial. *See Marshall v. Lonberger*, 459 U.S. 422, 438, 103 S.Ct. 843, 853, 74 L.Ed.2d 646 (1983); *Spencer v. Texas*, 385 U.S. 554, 567–69, 87 S.Ct. 648, 655–56, 17 L.Ed.2d 606 (1967); *Julius v. Johnson*, 840 F.2d 1533, 1541 (11th Cir.) ("at the present time, the practice of using evidence of a past conviction in the trial of Alabama death cases is permissible under the Constitution"), *modified*, 854 F.2d 400 (11th Cir.) (en banc; per curiam), *cert. denied*, 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988). When Thigpen was tried, the Alabama courts held that evidence of a life sentence was admissible under section 13–1–75 despite the possibility of prejudice. *See Williams v. State*, 239 Ala. 296, 195 So. 213, 214 (1940).

Second, when a criminal defendant chooses to testify in his own defense, he puts his credibility in issue, and evidence of prior convictions is properly admissible to impeach. *See* Ala.Code § 12–21–162(b) (1975) (evidence of crimes involving "moral turpitude" admissible to impeach witness); *Harbin v. State*, 397 So.2d 143, 144 (Ala.Civ. App.) (murder is a crime of moral turpitude), *cert. denied*, 397 So.2d 145 (Ala. 1981). Thus, the State argues, the evidence was properly admissible to impeach Thigpen's credibility.

We address neither of these arguments. We will assume that, because section 13–1–75 was unconstitutional when Thigpen was tried, none of the evidence was properly admitted under that statute. In addition, we will accept Thigpen's argument on appeal that he would not have testified if the evidence of his prior conviction and sentences had not been admitted earlier in the trial.[21] If the evidence was properly admissible for a purpose other than under section

13–1–75 or to impeach Thigpen's credibility, however, Thigpen suffered no undue prejudice from its introduction, and his conviction was not fundamentally unfair. *Cf. Zant v. Stephens*, 462 U.S. 862, 886, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983) (although evidence of prior convictions had been admitted in the sentencing phase of a capital case to support a statutory aggravating circumstance that was later declared unconstitutional, the sentence was still valid because the evidence was "fully admissible" under another provision of the sentencing statute).

Under Alabama law, all relevant and material evidence is admissible unless some exception to this rule bars its admission. *See Dawkins v. State*, 455 So.2d 220, 221 (Ala.Crim.App.), *cert. denied*, No. 83–1119 (Ala. Aug. 31, 1984). Evidence is relevant if it has "any probative value, however slight," *Primm v. State*, 473 So.2d 1149, 1157 (Ala.Crim.App.1985), or if it "throws, or tends to throw, any light upon the guilt or the innocence of the prisoner," *Nicks v. State*, 521 So.2d 1018, 1026 (Ala.Crim.App. 1987) (quoting Underhill, Criminal Evidence § 154 (3d ed. 1923)), *aff'd sub nom. Ex parte Nicks*, 521 So.2d 1035 (Ala.) (en banc; per curiam), *cert. denied*, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). It is material if it has some "logical connection or pertinency to the disputed issue." *Dawkins*, 455 So.2d at 221. A court, in its discretion, may exclude relevant and material evidence if it: (1) is unduly prejudicial or patently unfair to the opposing party, *id.* at 222, i.e., "would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury," C. Gamble, McElroy's Alabama Evidence § 21.01(4) (3rd ed. 1977) [hereinafter McElroy's Alabama Evidence]; (2) would only confuse or multiply the issues in the minds of the jurors, *McCall v. State*, 501 So.2d 496, 504 (Ala.Crim.App.1986), *cert. denied*, No. 85–1283 (Ala. Jan. 30, 1987); McElroy's Alabama Evidence § 21.01(3); or (3) is too remote in time from the issues at trial, *Ex parte Cofer*, 440 So.2d 1121, 1124

---

**21.** By making these assumptions, we express no opinion on the merits of the parties' contentions on these points.

(Ala.1983); *White v. State*, 527 So.2d 1349, 1351 (Ala.Crim.App.), *cert. denied*, No. 87–867 (Ala. July 15, 1988); McElroy's Alabama Evidence § 21.01(2).

■ Evidence of an extrinsic offense, especially a prior conviction for a similar crime, is undeniably relevant to the jury's determination of whether the defendant committed the crime for which he is on trial (the "charged crime"): that a person has been convicted of a previous first-degree murder, for instance, suggests that he committed the first-degree murder at issue, because he may have a propensity to commit violent crimes. *See Michelson v. United States*, 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948) (extrinsic offense evidence "might logically be persuasive that [the defendant] is by propensity a probable perpetrator of the [charged] crime"); *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); Schroeder, *Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law*, 35 Ala. L.Rev. 241, 242–43 (1984) [hereinafter Schroeder, *Collateral Crimes*].

This relevant evidence, however, is likely to be extremely prejudicial to the defendant: the jury may attach undue importance to the extrinsic offense. *See Ex parte Arthur*, 472 So.2d 665, 668 (Ala.1985) (evidence "has almost an irreversible impact upon the minds of the jurors"); *Hinton v. State*, 280 Ala. 48, 189 So.2d 849, 853 (1966) (evidence may "work great injury to the accused"); *McCary v. State*, 39 Ala. App. 642, 107 So.2d 903, 905 (1958) ("care should always be taken not to convict an accused of one alleged crime because he [is] guilty of another"), *cert. denied*, 268 Ala. 697, 107 So.2d 906 (Ala.1959); *see also Michelson*, 335 U.S. at 475–76, 69 S.Ct. at 218 (evidence "weigh[s] too much with the jury and ... overpersuade[s] them to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge").

■ The Alabama courts, in response to this potential for dangerous prejudice, have created a prophylactic rule: evidence of an extrinsic offense is not admissible if it shows *only* the defendant's bad character and the likelihood that he acted in conformity therewith by committing the charged crime. *Averette v. State*, 469 So.2d 1371, 1373 (Ala.Crim.App.1985); McElroy's Alabama Evidence § 69.01(1); Schroeder, *Collateral Crimes*, 35 Ala.L.Rev. at 242–43; *see also, e.g., Ex parte Tucker*, 474 So.2d 134, 135 (Ala.1985); *Nicks*, 521 So.2d at 1025 ("Under Alabama law, evidence of any offense other than that specifically charged is prima facie inadmissible.").

■ If, however, the extrinsic offense evidence meets two requirements, it is admissible. First, the extrinsic offense must be relevant to some element or aspect of the charged crime, such as motive, identity, or intent; it must tend to prove the defendant's guilt of the charged crime for a reason *other* than bad character. *See, e.g., Mason v. State*, 259 Ala. 438, 66 So.2d 557, 559 (1953); *Nelson v. State*, 511 So.2d 225, 234 (Ala.Crim.App.1986), *aff'd sub nom. Ex parte Nelson*, 511 So.2d 248 (Ala.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); *Barton v. State*, 494 So.2d 943, 952 (Ala.Crim.App.1986).

The Alabama courts have provided a list of elements or aspects of a charged crime to which an extrinsic offense may be relevant: (1) physical capacity, skill, or means to commit the charged crime; (2) the res gestae of the crime; (3) identity of person or crime; (4) scienter or guilty knowledge; (5) intent; (6) plan, design, scheme, or system; (7) motive; (8) malice; (9) to rebut special defenses; or (10) aspects of various particular crimes. *See, e.g., Nelson*, 511 So.2d at 233; *Barton*, 494 So.2d at 952; *Miller v. State*, 405 So.2d 41, 46 (Ala.Crim. App.1981); *Harmon v. State*, 47 Ala.App. 576, 258 So.2d 917, 919 (1972) (per curiam); *see also* McElroy's Alabama Evidence § 69.01(2)–(11); Schroeder, *Collateral Crimes*, 35 Ala.L.Rev. at 248.[22]

---

**22.** Alabama law is unclear on whether evidence of extrinsic offenses is admissible if it is rele-

vant to aspects of the charged crime that are not included in this list. *Compare Nicks*, 521 So.2d

Second, the extrinsic offense must be material—it must be relevant to an aspect of the charged crime which is a "real and open issue" in the case. *Ex parte State*, 538 So.2d 1226, 1227 (Ala.1988); *see also Ex parte State*, 507 So.2d 972, 974 (Ala. 1987); *Boggs v. State*, 268 Ala. 358, 106 So.2d 263, 265 (1958); *Averette*, 469 So.2d at 1373. Such an aspect generally becomes a real and open issue through a factual or legal position the defendant takes at trial, by the evidence he proffers, by the manner of cross-examination, or by argument. If it is clear that the defendant intends to raise such an issue, the state may introduce evidence of the extrinsic offense in its case in chief. *See Nicks*, 521 So.2d at 1025 ("Alabama law provides for the admissibility of evidence of collateral crimes ... *as part of the prosecution's case in chief* if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting he is more likely to be guilty because of his past misdeeds" (emphasis added)); Schroeder, *Collateral Crimes*, 35 Ala.L.Rev. at 243; *cf. Beechum*, 582 F.2d at 904 (extrinsic offense evidence properly admitted in Government's case in chief).[23]

When evidence of an extrinsic offense is admissible because it is relevant to a real and open issue other than character, the danger of prejudice still exists, but this cost is acceptable because of the added value of the evidence in proving the charged crime. As we have stated above, however, the court in its discretion may exclude this material and relevant evidence if its probative value is substantially outweighed by the undue and unfair prejudice it may create, *Averette*, 469 So.2d at 1374, if it might tend to confuse or multiply the issues in the minds of the jurors, *McCall*, 501 So.2d at 504, or if the extrinsic offense is too remote in time[24] from the charged crime, *White*, 527 So.2d at 1351; *Cofer*, 440 So.2d at 1124.[25]

 Under these rules, the evidence of Thigpen's prior conviction was admissible. It was relevant to motive, which tended to prove the identity of the killer—a real and open issue in this case.[26] At trial, Thigpen,

---

at 1025 (the list consists of "tests for relevancy") *and* McElroy's Alabama Evidence § 69.01(1) ("the better reasoned view" is that the list is not exclusive) *with Hinton*, 189 So.2d at 853 (the tendency of collateral crimes evidence to "work great injury to the accused renders its admission reversible error, unless it is brought within one of the exceptions recognized by law") *and Andrews v. State*, 359 So.2d 1172, 1176 (Ala.Crim. App.1978) (the law recognizes "certain well-delineated exceptions"). As we find that the evidence of Thigpen's prior conviction is relevant to the recognized exception for motive, we do not address the question of the exclusivity of the list of exceptions.

**23.** The defendant's plea of not guilty, though, also may put an element of the charged crime, such as intent, at issue. *See United States v. Roberts*, 619 F.2d 379, 382–83 & n. 2 (5th Cir. 1980) (a not guilty plea in a conspiracy case puts intent at issue, and the government may introduce evidence of extrinsic offenses relevant to intent); *see also Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988) ("A simple plea of not guilty puts the prosecution to its proof as to all elements of the crime charged." (citation omitted)). *But see Cofer*, 440 So.2d at 1124 (intent not in issue for the crime of first-degree sexual assault, although intent was an element of the crime, when the jury could infer intent from the victim's testimony); *Williams v. State*, 350 So.2d 708, 709 (Ala. 1977) (a plea of not guilty does not put identity

in issue); *Brewer v. State*, 440 So.2d 1155, 1160 (Ala.Crim.App.), *cert. denied*, No. 83–49 (Ala. Nov. 23, 1983).

**24.** If the extrinsic offense is so remote that it is not relevant to the charged crime, it is inadmissible. If it is relevant but remote, the court may, in its discretion, exclude it. *See Nicks*, 521 So.2d at 1026 ("If the evidence is not so remote as to lose its relevancy, the decision to allow or not allow evidence of collateral crimes ... rests in the sound discretion of the trial judge.").

**25.** Although many Alabama cases considering the admission of evidence of extrinsic offenses do not explicitly engage in an analysis of whether undue prejudice outweighs probative value, *see, e.g., Nelson*, 511 So.2d at 236; *Miller*, 405 So.2d at 46–47, others state clearly that a judge, in Alabama, may exclude evidence of extrinsic offenses when this test is met, *see, e.g., Averette*, 469 So.2d at 1374.

**26.** Thigpen's escape from Holman Prison undoubtedly would have been admissible as part of the circumstances, or res gestae, of the crime, and as part of a continuous criminal transaction. *See Reeves v. State*, 432 So.2d 535, 538 (Ala.Crim.App.1983) (evidence of escape admissible to prove robbery and rape committed shortly thereafter). From Thigpen's incarceration in a maximum-security prison, the jury

through Williams' testimony, raised the issue of the *identity*[27] of the killer: Did Thigpen or Williams kill Lambeth? *See Ex parte State*, 507 So.2d at 975 (identity would be at issue if the defendant had argued that "someone else committed the acts with which he was charged," instead of denying that the acts ever occurred). Motive is often highly relevant when the defendant places his identity in issue. *See United States v. Benton*, 637 F.2d 1052, 1056 (5th Cir. Unit B Feb.1981) ("motive ... may be evidence of identity"); *United States v. Turpin*, 707 F.2d 332, 336 (8th Cir.1983); *see also* 22 C. Wright & K. Graham, Federal Practice and Procedure § 5240, at 480 (1978) ("motive is not an ultimate issue; therefore, proof of motive must always be directed at some other fact that is an ultimate issue in the case[, such as] ... to prove the identity of the actor"). When a defendant, like Thigpen, has asked the jury to believe that someone else committed the charged crime, knowledge of the defendant's motive or lack thereof will help the jury to determine whether to accept or reject the defense.[28] Thus, if evidence of Thigpen's prior conviction would help the jury to reach a decision—if it has "any probative value, however slight," *Primm*, 473 So.2d at 1157—on whether Thigpen or

Williams had the stronger *motive* to kill Lambeth, then the evidence was admissible.

We find that Thigpen's prior conviction was relevant to this determination. Murder was not necessary to steal the truck under any version of the crime: Lambeth had left the keys inside, and there was consequently no need to subdue him to get them. The killing was thus unprovoked, unnecessary, and contrary to plan. Because Thigpen had been convicted of first-degree murder and was serving a life sentence when he escaped, he had the most to lose from being captured, and the added hours of escape time gained by Lambeth's death were more valuable to him. Thigpen, therefore, had the stronger motive.

Unlike Thigpen, Williams had an incentive not to kill Lambeth. Williams had been serving a fifteen-year sentence when he escaped. If he was captured and returned to prison, the time added to his sentence for escape and for the theft of the truck would be considerably less than the time added for Lambeth's murder. If we assume that Thigpen believed, because of his previous experience with a death sentence, that he could not be sentenced to death if he killed Lambeth,[29] then Thigpen

---

could infer either that he had committed a serious crime which caused him to be put in Holman or that he had been placed there because the security of a maximum-security prison was necessary to prevent his escape or to protect other prisoners. We may not logically assume, however, that the jury could also infer that Thigpen had been convicted for first-degree murder and sentenced first to death and then to life in prison. The res gestae exception, therefore, will not account for the major prejudicial evidence in the case.

**27.** Generally, an extrinsic offense is relevant to show the identity of the perpetrator of the charged crime only when both crimes were committed in such a "novel and peculiar manner" that it is likely that they were committed by the same person. *Nicks*, 521 So.2d at 1027; *see also Arthur*, 472 So.2d at 668 (the offenses must share "such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person" (quoting *Brewer*, 440 So.2d at 1161)). Here, however, Thigpen's prior crime is not direct proof of his identity as the killer (as might be the case if he had committed an identi-

cal crime in the same circumstances once before); it shows, instead, that because he had a greater motive to kill Lambeth, he is more likely to be the killer than Williams. When an extrinsic offense is introduced to show motive, the state need not show that the extrinsic offense is similar to the charged crime. *See United States v. Johnson*, 542 F.2d 230, 234 n. 10 (5th Cir. 1976) (dictum).

**28.** Motive has been defined as "the reason that nudges the will and prods the mind to indulge the criminal intent," *Benton*, 637 F.2d at 1056 (quoting *Beechum*, 582 F.2d at 912 n. 15), or "the moving power which leads the mind to desire the result and form the purpose," *Ex Parte State*, 538 So.2d at 1235.

**29.** It is doubtful that Thigpen knew of the existence of section 13–1–75. According to Thigpen's habeas petition, the statute had only been used 9 times since it was enacted.

If we make the unlikely assumption that Thigpen knew about section 13–1–75, this argument is reversed. If the possibility of a death penalty was part of Thigpen's state of mind on the day of the murder, and he knew that only he, and

had nothing to lose if he killed Lambeth and were caught: another life sentence would not add appreciably to his time in prison.

Moreover, if Thigpen were captured, he had at least eight more years to serve before he would be eligible for parole. Williams, on the other hand, could serve, at most, five more years before he would be eligible.[30] It is also possible that Thigpen's state of mind on the day of the murder was affected by knowledge of the possibility of a long wait for parole if he were recaptured, after escaping while serving a life sentence for first-degree murder and committing a second murder. He thus had a greater incentive not to be captured than Williams. By killing Lambeth, Thigpen and Williams gained a few extra hours before the theft of the truck was reported and its description conveyed to searchers.[31] As we have shown, Thigpen would receive more benefit from these few extra hours than Williams.

The relevance of Thigpen's prior conviction to his motive to murder Lambeth, and thereby to the identity of the killer, is clearly illustrated by a discussion of a hypothetical closing argument that could have been made had the evidence not been admitted. Without this evidence, Thigpen's defense attorneys could have argued that Williams, not Thigpen, was the desperate character with the most to lose. They might have implied, for instance, that Williams was the dominant member of the pair, who took the lead in the escape and was more likely to have struck the fatal blow which killed Lambeth. At oral argument before us, Thigpen's attorney provided a clear example of the interpretation the defense might have urged to the jury without the relevant evidence of Thigpen's prior conviction: he stated that the letter which Thigpen ostensibly sent to Williams was not a letter attempting to coerce Williams into remaining silent or changing his story, but instead was offered in "camaraderie," to show Thigpen's support and affection for a friend who was in trouble by warning him that he should not admit the murder to authorities. In this interpretation, Thigpen was protecting Williams, not himself.

■ Once we have determined that evidence of Thigpen's prior conviction was admissible, because it was relevant to motive, a real and open issue in the case, we must decide whether the trial judge, if he had admitted the evidence for this purpose, would have abused his discretion. We note that some Alabama case law indicates that the trial judge may *never* exclude evidence which is relevant to motive. In *Kelley v. State*, 409 So.2d 909, 914 (Ala.Crim.App. 1981), the court interpreted language from some Alabama cases indicating that motive is *"always* admissible," *see, e.g., Ex parte State*, 538 So.2d at 1235 (but presumably may be excluded if the trial judge, in his discretion, determines that the prejudicial effect substantially outweighs the probative value), to find that such evidence, even if "slight" or "weak and inconclusive," "is not to be excluded, but should be left to the consideration of the jury." We find, however, that even if we apply the general Alabama rule that the court may exclude otherwise relevant and material evidence when its potential for undue prejudice substantially outweighs its probative value, the trial judge did not abuse his discretion by admitting the evidence. *See Kelley*, 409

not Williams, could receive this death penalty (because Williams was not serving a life term), then Thigpen had an incentive not to kill Lambeth.

**30.** Testimony at Thigpen's evidentiary hearing on his petition for a writ of error coram nobis revealed that when Lambeth was killed, an Alabama prisoner was eligible for parole after one-third of his sentence or ten years, whichever was less. Prisoners received parole after interviews with the three members of the parole board. Because Williams was serving 15 years (one five- and one ten-year sentence), he was eligible for parole in five years; the record does not reveal when he began his term. Thigpen was serving a life term, which started in 1973 when the Alabama court reduced his original death sentence. In 1975, therefore, he had to serve eight more years before he was eligible for parole.

**31.** Another possible incentive for killing Lambeth was to escape prosecution for the theft of the truck, to which Lambeth was the only witness. This incentive applied equally to Williams.

So.2d at 913–14 (evidence of motive is especially probative when the evidence is in conflict or circumstantial on the issue of whether the accused committed a particular act). Moreover, the evidence would not confuse the jury or multiply the issues, and it was not too remote in time from the charged crime.

Alabama courts have permitted the admission of evidence of extrinsic offenses in analogous circumstances. In *Nelson*, the defendant claimed that he had accidentally shot the victim before stealing the victim's car. The court, reasoning that "[t]he evidence of the [prior] killing ... could reasonably reflect a desire to escape and thus shed light on the motive for the [charged] murder," 511 So.2d at 236, admitted evidence of a murder that the defendant had committed four hours before the charged murder to show motive and intent. *See also Coleman v. State*, 552 So.2d 156, 158 (Ala.Crim.App.1988) (evidence that defendant had stabbed victim admissible to show motive for stealing car; defendant, because of stabbing, "wanted to leave Alabama immediately"); *Harmon*, 258 So.2d at 919 (evidence that defendant admitted to killing a police officer "could reasonably reflect a desire for escape and thus shed light on the motive" for stealing a car); *Vincent v. State*, 231 Ala. 657, 165 So. 844, 846 (evidence of prior robbery admissible to show

motive for shooting police officer during attempt at a second robbery "to rescue [defendant and] his associate ... from the consequences of apprehension and punishment"), *cert. denied*, 298 U.S. 682, 56 S.Ct. 960, 80 L.Ed. 1402 (1936); *Hodge v. State*, 199 Ala. 318, 74 So. 373 (1917) (evidence of illegal acts admissible to show motive for murder of police officer investigating the acts).[32]

█ Moreover, the State, in the case at hand, was entitled to prove the extrinsic offense by the introduction of the certified copy of the judgment entry during its case in chief. As we have shown, when it is clear that the defendant intends to create an issue of fact for which there is an exception to the general rule that extrinsic offenses are not admissible, the state may introduce extrinsic offense evidence in its case in chief. *See supra* p. 1015. At Thigpen's trial, it was obvious, before the State introduced the evidence of Thigpen's prior conviction, that Williams would testify and would raise the issue of identity, and thus motive. Williams had given the State three separate and inconsistent versions of the murder which incriminated Thigpen. Thigpen, nonetheless, had subpoenaed Williams, who was in prison, to testify in Thigpen's defense, and had asked the court to order that he be brought to court for that purpose. Clearly, Thigpen wanted Williams'

---

**32.** Moreover, in the cases in which federal and other state courts have considered analogous issues, they generally find that evidence of the prior conviction is relevant and admissible. *See Porter v. Estelle*, 709 F.2d 944, 955–56 (5th Cir. 1983) (applying Texas law before Texas adopted the federal rules of evidence) (evidence of an earlier robbery admissible to prove motive for killing a police officer to avoid apprehension), *cert. denied*, 466 U.S. 984, 104 S.Ct. 2367, 80 L.Ed.2d 838 (1984); *United States v. Johnson*, 542 F.2d 230, 234 & n. 10 (5th Cir.1976) (dictum) (district court could have admitted evidence of prior felony conviction and outstanding warrant to show defendant's motive for threatening FBI agents with firearm; the evidence showed the defendant's "strong interest in avoiding the FBI agents' clutches"); *United States v. Peltier*, 585 F.2d 314, 321–22 (8th Cir. 1978) (evidence that defendant was wanted on an outstanding warrant for attempted murder admissible to show his motive for the murders of two FBI agents), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *People v.*

*Powell*, 40 Cal.App.3d 107, 115 Cal.Rptr. 109, 140 (Dist.Ct.App.1974) (evidence of parole status relevant to show motive for killing officer to avoid revocation of parole), *cert. denied*, 420 U.S. 994, 95 S.Ct. 1435, 43 L.Ed.2d 677 (1975); *Heiney v. State*, 447 So.2d 210, 214 (Fla.) (evidence of prior shooting admissible to show motive for killing man and stealing car and money to avoid apprehension), *cert. denied*, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984); *State v. Tharp*, 27 Wash.App. 198, 616 P.2d 693, 698–99 (1980) (defendant's status on furlough and prior conviction admissible to show motive for killing man who surprised him stealing a car; defendant "knew his status on furlough would be an aggravating factor if he were apprehended and convicted" for car theft), *aff'd*, 96 Wash.2d 591, 637 P.2d 961 (1981). *But see People v. Alcala*, 36 Cal.3d 604, 205 Cal.Rptr. 775, 685 P.2d 1126, 1143–44 (1984) (en banc) (evidence of prior crimes not admissible to show motive to eliminate witness because apprehension might result in a more severe punishment).

testimony because Williams intended to change his story and had so notified Thigpen or his attorneys. The admission of a certified judgment entry to show the prior conviction was proper. *Arthur*, 472 So.2d at 667; *McGhee v. State*, 333 So.2d 865, 869 (Ala.Crim.App.1976).

 Finally, Thigpen was not prejudiced by the absence of a limiting instruction telling the jury to consider the evidence of his prior conviction only for motive, and warning it not to consider the prior conviction to show a propensity for criminal behavior. When evidence of an extrinsic crime is admitted because it is relevant to motive or one of the other exceptions, the defendant is entitled to such a limiting instruction. 1 Wharton's Criminal Evidence § 203, at 892 (14th ed. 1985); Schroeder, *Collateral Crimes*, 35 Ala.L.Rev. at 246–47; *see also Deep v. State*, 414 So.2d 141, 149 (Ala.Crim.App.), *cert. denied*, No. 81–499 (Ala. May 21, 1982). Because Thigpen's prior conviction was admitted under section 13–1–75, he neither requested nor received such an instruction. The jury was instructed, however, not to consider the evidence *at all* in relation to Thigpen's guilt or innocence. *See supra* p. 1009. Thus, the lack of an instruction limiting the use to which the jury could put the evidence in determining Thigpen's guilt or innocence could not have prejudiced him.

### IV.

We find that the evidence of Thigpen's prior conviction was relevant and admissible to show his motive, and that its potential for undue prejudice did not substantially outweigh its probative value. As a result, the trial was not rendered fundamentally unfair. The decision of the district court is, therefore

AFFIRMED.