[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 31, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-12598

_____

D. C. Docket No. 99-01413 CV-ORL-18KRS

TED HERRING,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF
CORRECTIONS,
ATTORNEY GENERAL, STATE OF
FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(January 31, 2005)**

Before BIRCH, DUBINA and BLACK, Circuit Judges.

BLACK, Circuit Judge:

Appellant Ted Herring filed a habeas petition under 28 U.S.C. § 2254 challenging his 1982 state-court convictions for armed robbery and first-degree murder, and his resulting death sentence. The district court denied Herring's petition. We granted a certificate of appealability (COA) on three issues. We now affirm.

## I. BACKGROUND

A.  *Factual Background*

On May 29, 1981, Herring held up a 7-Eleven convenience store in Daytona Beach. Herring shot and killed the store clerk. A hold-up note was found at the scene. At some point, the police determined that Herring's fingerprint was on the note. The murder weapon was never found.

After the robbery, Herring was arrested on charges relating to a stolen car and was taken to the Daytona Beach Police Station. He waived his *Miranda* rights and made three statements, in two of which he confessed to the robbery and homicide at the 7-Eleven store. Three officers were involved in the interrogations.

In his first statement, which was taped, Herring told the officers he went to the store with the intent to commit a robbery, but before he could commit the crime, a second man robbed the store and killed the clerk. In a second, unrecorded statement made privately to Detective Varner, Herring stated he shot the clerk in

2

the head and then, while the clerk was lying on the ground, shot the clerk a second time to eliminate him as a witness. In a final, taped statement to the officers, Herring claimed he robbed the store and only accidentally shot the clerk when he thought the clerk was coming across the counter. Herring stated he shot the clerk a second time out of fear.

B.    *Procedural Background*

In February 1982, Herring was tried in Volusia County for armed robbery and first-degree murder. He was represented by two public defenders: Howard Pearl and Peyton Quarles. Pearl handled the guilt phase of the trial and Quarles handled the penalty phase.

Detective Varner testified at the guilt phase regarding Herring's unrecorded statement. Following Varner's direct testimony, Pearl cross-examined him on the length of interrogation and whether Herring received food or time to rest during the interrogation. Pearl similarly cross-examined the two other officers involved in questioning Herring. Herring testified on his own behalf, relating his initial story—that he planned to commit the robbery, but another person beat him to it and killed the clerk.

The jury found Herring guilty on both counts against him. The penalty phase followed. The only witness testifying in mitigation was Herring's mother,

3

Dorothy Meyers. The jury returned an advisory sentence of death by an eight-to-four vote.

The trial judge sentenced Herring to death. In aggravation, the trial judge found and considered as aggravating circumstances: (1) "[t]he Defendant has been previously convicted of another capital offense or of a felony involving the use o[r] threat of violence to some person;" (2) "[t]he crime for which the Defendant [wa]s to be sentenced was committed while he was engaged in the commission of the crime of robbery;" (3) "[t]he crime for which the Defendant [wa]s to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;" and (4) "[t]he crime for which this Defendant [wa]s to be sentenced was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." In mitigation, the trial judge found and considered as mitigating circumstances: (1) the Defendant was 19 years old at the time of the crime; and (2) "Defendant had a difficult childhood," *i.e.*, "Defendant was raised essentially without a father, was hyperactive, had learning disabilities, and had trouble in school." The Florida Supreme Court affirmed Herring's convictions and death sentence on direct appeal.

4

In April 1985, Herring filed his first Florida Rule of Criminal Procedure 3.850 motion for post-conviction relief. The state trial court denied the motion and the Florida Supreme Court affirmed. In March 1987, Herring filed a petition in the Florida Supreme Court for a writ of habeas corpus. The Florida Supreme Court denied relief. Herring then filed a petition in federal court under 28 U.S.C. § 2254 for a writ of habeas corpus. The district court dismissed the petition without prejudice due to Herring's failure to exhaust his state court remedies.

In 1989, Herring filed a second Rule 3.850 motion, claiming, *inter alia*, that his death sentence should be vacated under *Rogers v. State*, 511 So. 2d 526, 533 (Fla. 1987), which declared the premeditation aggravator inapplicable to cases like Herring's. The state trial court denied relief under *Rogers*. The court did, however, grant Herring leave to amend his motion to add a claim that Pearl operated under an impermissible conflict of interest in serving both as Herring's trial counsel and as a special deputy sheriff. The trial court denied the amended motion. The Florida Supreme Court held the premeditation aggravating factor should not have been applied, but affirmed without granting a new sentencing hearing. On the conflict-of-interest claim, the court remanded for an evidentiary hearing.

On remand, Herring's conflict-of-interest claim was consolidated for hearing with similar claims raised by other defendants who had been represented by Pearl. The state trial judge denied relief. The Florida Supreme Court remanded for individual hearings on the appealed cases, including Herring's. The state trial court held a second hearing and again denied Herring's conflict-of-interest claim. The Florida Supreme Court affirmed.

Herring filed a § 2254 petition for a writ of habeas corpus in federal district court. The district court denied relief and denied a COA. This Court granted a COA on three issues:

> (1) Whether the Florida Supreme Court acted contrary to *Clemons v. Mississippi*, 110 S. Ct. 1441 (1990) and violated the Eighth and Fourteenth Amendments in upholding Herring's sentence despite the elimination of the heightened premeditation aggravating circumstance;

> (2) Whether Herring was deprived of the effective assistance of counsel at the sentencing phase of his criminal trial; and

> (3) Whether, in evaluating Howard Pearl's conflict of interest under the Sixth Amendment, the state courts unreasonably applied *Cuyler v. Sullivan*, 100 S. Ct. 1708 (1980) to the facts of Herring's case.

## II.  DISCUSSION

A.  *Standard of Review Under 28 U.S.C. § 2254*

Our habeas review of a state court's rulings is restricted by § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Section 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 1523 (2000). A state court's decision involves an "unreasonable application" of clearly

established federal law under § 2254(d)(1) if its application is objectively unreasonable. *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001). "[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Williams*, 529 U.S. at 412, 120 S. Ct. at 1523.

A federal court's review is further restricted by 28 U.S.C. § 2254(e), which provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

B.      *Claim under* Clemons v. Mississippi

Under the Supreme Court's ruling in *Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441 (1990), when a state appellate court determines a death sentence is based on an invalid or improperly defined aggravating factor, that court may reweigh the aggravating and mitigating evidence, conclude the error was harmless, or remand for a new sentencing. *Id.* at 741, 754, 110 S. Ct. at 1444, 1451.

Herring contends that when the Florida Supreme Court struck the heightened premeditation aggravating circumstance but nevertheless affirmed his death sentence, it failed to conduct any of the three analyses set out as permissible

in *Clemons*. In response, the State argues: (1) Herring's claim is procedurally barred; (2) Herring's claim alleges nothing more than an error of state law and therefore is not cognizable in federal habeas corpus; and (3) Herring received all the process he was due. The district court rejected Herring's claim on two bases, one of which was that the claim was procedurally barred.

Herring did not present any arguments pertaining to procedural bar in his initial brief. In his reply brief, however, Herring argues his *Clemons* claim is not procedurally barred because he did present his *Clemons* argument to the Florida Supreme Court during proceedings on his second 3.850 motion and the Florida Supreme Court reached the merits of his claim.[1] As we repeatedly have admonished, "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) (citation omitted); *see also United States v. Whitesell*, 314 F.3d 1251, 1256 (11th Cir. 2002) (Court need not address issue raised for first time in reply brief), *cert. denied*, 539 U.S. 951, 123 S. Ct. 2628 (2003); United *States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999) (issue raised for first time in reply brief waived); *United States v. Martinez*, 83 F.3d 371, 377 n.6 (11th Cir. 1996) (declining to

---

[1] We note Herring does not argue in the alternative that there is cause and prejudice excusing his procedural default or that, if raised for the first time in state court now, it would not be barred under state law procedural bar principles.

consider arguments raised for the first time in a reply brief). Although Herring's failure to present his procedural bar argument in his initial brief is determinative, we nevertheless briefly discuss procedural bar and the arguments Herring raises in his reply brief.

"A state habeas corpus petitioner who fails to raise his federal claims properly in state court is procedurally barred from pursuing the same claim[s] in federal court absent a showing of cause for and actual prejudice from the default." *Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506–07 (1977)). This procedural default arises in two situations: (1) where the state court itself correctly applies state law procedural bar principles to conclude a federal claim is barred; and (2) where a claim was never raised in state court, and it is clear the unexhausted claim would now be barred under state law procedural bar principles. *Id.* at 1302–03 (citations omitted). The State's argument is that Herring's *Clemons* claim falls within the second category. We agree.

Herring challenged the application of the cold, calculated, and premeditated aggravating factor in his direct appeal.

Herring again challenged the application of the aggravating factor in his initial brief appealing the denial of his second Rule 3.850 motion, and argued a

new sentencing hearing should be conducted. In his reply brief to the Florida

Supreme Court, Herring argued the jury's improper consideration of the

heightened aggravating factor could not be harmless beyond a reasonable doubt.

Herring further stated:

> Indeed, because "the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances," *Elledge*, 346 So. 2d at 1003, this Court has consistently ordered new sentencing hearings in similar cases. . . . The result here should be no different. *Cf. Clemons v. Mississippi*, 58 U.S.L.W. 4395, 4399–4400 & n.5 (Mar. 28, 1990) (failure to remand to a sentencing jury violates the Constitution "if the decision is made arbitrarily").

The Florida Supreme Court struck the challenged aggravating factor, but affirmed

Herring's death sentence stating:

> While the cold, calculated, and premeditated aggravating factor no longer applies to the circumstances in *Herring*, we find that this is not a change that requires a new sentencing hearing in this case. None of the facts and circumstances that were before the jury regarding how Herring committed the murder are changed. If the aggravating circumstance of a 'conviction of a prior crime of violence' had been eliminated, that would have changed the facts and circumstances before the jury.
>
> The evidence before the jury established that Herring shot the clerk once in the head and again after the clerk fell to the floor and that the second shot was to prevent the clerk from being a witness against him. Given the other aggravating and mitigating factors that went into the weighing process in the sentencing phase of this case, we find that the result of the weighing process would not have been different had this aggravating circumstance not been articulated as a

11

factor in the sentencing.  We find that the elimination of this factor, under the circumstances of this case, does not compromise the weighing process of either the judge or jury.

*Herring v. State*, 580 So. 2d 135, 138 (Fla. 1991) (citations omitted).

In his motion for a rehearing, Herring made three arguments as to why the Florida Supreme Court's decision was incorrect.  Herring first argued the court committed constitutional error in that it failed to apply its "long-standing rule" of remanding for a new sentencing hearing when it strikes one or more aggravating circumstances relied on at sentencing and mitigating circumstances are present. Herring cited *Clemons* in this section of his motion, including again a parenthetical stating that "failure to remand to a sentencing jury violates the Constitution 'if the decision is made arbitrarily.'"  In its response, the State pointed out that in *Clemons*, the Supreme Court "established that state courts may conduct a harmless error analysis if an aggravating circumstance is stricken." Herring acknowledged as much in his second argument—that the Florida Supreme Court's "finding of harmless error [could not] be squared with the facts of th[e] case."[2]  Importantly, although Herring challenged the court's finding of harmless

---

[2] Herring cited *Clemons* in this section of his motion as support for his contention that "[t]he circumstances surrounding both Herring's crime and his sentencing hearing make clear that the erroneous application of the heightened premeditation aggravating circumstance cannot be deemed harmless beyond a reasonable doubt."

12

error, he did not assert the court *failed to engage in* harmless error analysis.

Indeed, Herring asserted the Florida Supreme Court had engaged in harmless error

review, but argued the court erred in its finding of harmlessness. Herring's third

argument was that the court's opinion "appears to announce a new rule" that the

erroneous application of a statutory aggravator may be deemed harmless where

elimination of the circumstance does not alter the facts and circumstances

regarding how the defendant committed the murder, and thereby "calls into

question the constitutionality, as applied, of Florida's capital sentencing scheme."[3]

After reviewing Herring's state court filings, we conclude that, although

Herring made many arguments pertaining to the cold, calculated, and premeditated

aggravator, he did not preserve the argument he now makes—that the Florida

Supreme Court erred in affirming his sentence after striking the factor without

performing the analysis set out by the United States Supreme Court in

*Clemons*—and the Florida Supreme Court did not consider such a claim.

---

[3] With respect to this final point, Herring contended:

> In a case involving substantial mitigation, it is simply impossible to know how the sentencers would have performed the weighty, yet delicate, task of balancing the aggravating and mitigating factors in the absence of one of the aggravating factors. To suggest that the presence or absence of one of the aggravating factors in such a case makes no difference in the weighing process threatens to return the Florida statutory scheme to the "standardless discretion" condemned in *Furman*.

In summary, we affirm the district court's denial of Herring's claim. The district court found Herring's claim to be procedurally barred. Herring failed to argue the procedural bar issue in his initial brief. Even if the arguments set out in Herring's reply brief had properly been presented in his initial brief, we would have rejected them.[4]

C.      *Claim of Ineffective Assistance of Counsel at Penalty Phase*

Herring next claims he received ineffective assistance of counsel at the penalty phase of his trial. Peyton Quarles represented Herrring at the penalty phase. Herring makes a number of allegations of ineffectiveness. Neither the state courts nor the district court held an evidentiary hearing on Appellant's claims.

A petitioner is entitled to relief based on ineffective assistance of counsel when he establishes (1) his counsel's performance fell below an objective standard of reasonableness, and (2) "there is a reasonable probability that, but for counsel's errors and omissions, the result of the proceedings would have been different." *Parker v. Head*, 244 F.3d 831, 840 (11th Cir. 2001) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). Both prongs are

---

[4] For the first time, in a supplemental letter brief, Herring asserts additional procedural bar arguments. "[P]arties cannot properly raise new issues at supplemental briefing. *United States v. Nealy*, 232 F.3d 825, 830 (11th Cir. 2000) (citation omitted).

mixed questions of law and fact. *Mills v. Singletary*, 161 F.3d 1273, 1285 n.15 (11th Cir. 1998) (citation omitted).

1. *Quarles' failure to present mitigating evidence in his possession and failure to conduct a reasonable investigation*

During the penalty phase, Herring's mother, Dorothy Meyers, was the only witness to testify in mitigation. Herring contends Quarles should have done more in mitigation. Specifically, Herring contends: (1) Quarles was ineffective in that he failed to investigate and present other readily available mitigating evidence pertaining to Herring's mental condition, background, and character; and (2) Quarles was ineffective in that he failed to present mitigating evidence in his possession at the time of trial. Underlying Herring's failure-to-investigate claim is the premise that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066); *see also Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir. 1988) ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.") (citing *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986)).

a.       *State Court Decisions*

The state trial court held that Herring did not satisfy either prong of the

*Strickland* ineffectiveness inquiry.  That court concluded:

> 5.  The real nub of Defendant's motion is the claim of ineffective trial counsel.  Despite the standards set forth in *Knight* and *Strickland* it is very difficult to go back and determine whether trial counsel's actions or inactions amounted to ineffective assistance of counsel.  The Court will attempt to deal with the allegations of ineffectiveness and analyze them in light of *Knight* and *Strickland*.
>
> A.  In Paragraph "85" of the 3.850 the Defendant alleges there were reports (see Defendant's exhibits "3" and "4") that the Defendant had serious mental and emotional problems.  The Defendant now complains these reports should have been introduced.  First it should be noted that at least one of the reports was a result of an interview done when the Defendant was 13 years old.  Secondly, the defense did establish learning disabilities and psychological problems through the testimony of the Defendant's mother.  Thirdly, one of the reports indicates the mother, who was a defense witness and represented to be a concerned mother, was not keeping the child's appointments with the counselor.  Lastly, the reports indicate the Defendant was of dull normal intelligence.  Taking this all into consideration this Court does not find the failure to introduce these reports was a professional deficiency.
>
> B.  In Paragraph "86" of the 3.850 the defense claims trial counsel failed to adequately present other readily available mitigation evidence.  This is perhaps the most difficult assertion to analyze.  Here more than any other area there is tendency to second guess.  In every case that is lost counsel may go back, with the advantage of hindsight, and say this or that should or could have been done.

16

The defense had the Defendant's mother testify during the sentencing phase. She did establish the Defendant's home life was not good; his parents were separated; he was hyperactive with a low IQ and a learning disability; he had psychological problems; that his mother loved Ted. The psychological reports would have been cumulative to the mother's testimony. It also m[u]st be stressed that the trial court did list and consider these matters as mitigating factors.

As to the information set forth in exhibits "7" and "8" the Court questions the importance of the information from the Defendant's former teachers. Obviously much time had passed since they had contact with the Defendant. Their testimony was of doubtful value.

Perhaps the defense should have had the Defendant's other relatives testify on his behalf. While to a large degree it may have been cumulative to that of the mother, perhaps it may in someway [sic] have helped the Defendant. But this Court cannot conclude that trial counsel was deficient in presenting the mother alone. It must be remembered that the area of who trial counsel selects to testify i[s] fr[a]ught with peril. Even the mother, who was an effective defense witness, did admit her son was involved in drug related problems in New York. So trial counsel is caught in a dilemma. He must try to put on mitigating evidence yet not let the State have an opportunity to further damage the Defendant either by cross or rebuttal. This is especially true where the Defendant was charged with several other armed robberies and apparently was having drug related problems in New York City. All in all the Court finds trial counsel was not deficient in only presenting the mother's testimony. This is a matter of trial strategy and should not be second guessed.

. . . .

6. This Court must view trial counsel's alleged errors and omissions in light of the case as a whole. It was a difficult case from the defense standpoint. The Defendant confessed to the crime.

17

Efforts to suppress the confession failed. The Defendant not only initially gave conflicting stories to police but perhaps most damaging of all he told the jury the preposterous story of how a second robber "beat him to the punch"; robbed and shot the clerk. Frankly, this preposterous story doomed the Defendant not only as to a conviction but as to sentence as well. There was little the defense could do to save the Defendant after that.

Additionally, the aggravating factors in this case strongly outweighed the mitigating factors. There were four aggravating[5] and only two mitigating factors. The mitigating factor of age was not strong. The Defendant was at the point where his age was not that much of a consideration. Other non-statutory mitigating factors were in fact established by the defense. They were considered by the jury and the court. These mitigating factors were not particularly significant. This Court finds that even if the non-statutory mitigating factors were bolstered by teacher's statements, comments of relatives, and poems of the Defendant, the result would be no different.

7. The Court concludes that the *Knight/Strickland* tests are not met. The trial defense was not deficient, nor did it prejudice the Defendant. The Defendant received a fair trial and a fair sentence hearing.

The Supreme Court of Florida summarily affirmed, stating:

In his next point, Herring contends that an evidentiary hearing was necessary to decide his ineffective-assistance-of-counsel claims. The trial judge, in an extensive order, fully explained why each of the ineffective-assistance-of-counsel claims did not meet the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) and *Knight v. State*, 394 So. 2d 997 (Fla. 1981). We agree with the trial judge's findings and commend him for his detailed explanation.

---

[5] As explained in Section I.B., one of these aggravating factors was stricken by the Florida Supreme Court subsequent to the state trial court's 3.850 decision.

18

*Herring v. State*, 501 So. 2d 1279, 1280 (Fla. 1986).

As set out in Section II.A. above, our review of state court decisions is very deferential under § 2254, as amended by AEDPA. "AEDPA modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Parker v. Sec'y for the Dep't of Corrs.*, 331 F.3d 764, 768 (11th Cir.) (citation and internal quotation marks omitted), *reh'g and reh'g en banc denied*, 82 Fed. Appx. 224 (11th Cir. 2003), *cert. denied*, 540 U.S. 1222, 124 S. Ct. 1513 (2004). We may grant a § 2254 petition as to a claim adjudicated on the merits in state court only if adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To be entitled to deferential review under 28 U.S.C. § 2254, it is not necessary for the state court to explain its decision. Even a summary, unexplained rejection of a federal claim qualifies as an adjudication entitled to deference under § 2254(d). *Parker*, 331 F.3d at 775–76; *Wright v. Sec'y for the Dep't of Corrs.*, 278 F.3d 1245, 1253–55 (11th Cir.), *reh'g and reh'g en banc denied*, 34 Fed. Appx. 393

19

(11th Cir. 2002), *cert. denied*, 538 U.S. 906, 123 S. Ct. 1511 (2003). Moreover, factual findings made by the state courts are presumed to be correct; a petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state trial court judge who issued a ruling on Herring's ineffective-assistance-of-counsel claim is the same judge who presided at trial. The state trial judge was, therefore, intimately aware of everything that happened at, and was involved in, the trial. In an attempt to obtain similar familiarity, we have reviewed the entire record. It is evident from our review that the state court rulings were eminently reasonable and were not contrary to clearly established federal law.

We turn first to Herring's contention that Quarles did not perform a meaningful investigation into his mental condition. The state court[6] concluded Herring established neither deficient performance nor prejudice. The record supports the state court conclusions.

Contrary to Herring's contention, it is evident from the record that Quarles did investigate Herring's mental condition. Prior to trial, the defense had Herring

---

[6] The Florida Supreme Court expressly stated it agreed with the trial judge's findings. We use the term "state court" in this discussion to refer to the state trial court and the Florida Supreme Court.

20

evaluated by Dr. William Friedenberg, a clinical psychologist. The State subsequently took Dr. Friedenberg's deposition. In that deposition, Dr. Friedenberg said he had been appointed to evaluate Herring and had considered Herring's "ability to testify about the kind of charges against him and the events as they were reported by others." Dr. Friedenberg testified that, to aid in his evaluation of Herring, he had a 1974 St. Luke's Hospital evaluation of Herring; a report evaluating Herring's oral reading and written language; a copy of the autopsy request form from this case; and a supplemental report by the Daytona Beach Police Department. Dr. Friedenberg also had a closed 1980–81 HRC (Human Resources Center) file, which included a psychological evaluation dated October 30, 1980, reports from psychiatrists, a report on an EEG, and some notes.

In conducting his evaluation, Dr. Friedenberg saw Herring for about three hours. He stated Herring was anxious, but not abnormally so considering the circumstances. Also, Herring became increasingly animated in saying he was innocent and had been set up. Herring denied being at the murder scene.

Dr. Friedenberg administered some tests, but he did not perform an IQ test on Herring; rather, he relied on a 1974 test showing an IQ of 81 and a 1980 test showing an IQ of 82. Dr. Friedenberg said the consistency of the two results led him to believe it was not necessary to readminister an IQ test.

21

Dr. Friedenberg stated Herring was of dull normal intelligence, but that "would be significantly above what would be considered borderline, retarded or retarded range and includes approximately fifteen percent of the population." He further stated: "One has to understand that Mr. Herring has a rather limited formal education and there are many studies to show that that can affect I.Q. tests such as this by lowering the actual score below what the potential would be."

Dr. Friedenberg opined that Herring's IQ should not affect his ability to be a law abiding citizen and would only minimally interfere with Herring's ability to deal with the legal process.

Dr. Friedenberg's mental health conclusions from his evaluation of Herring were as follows:

> [H]e appeared to be most likely a person who would be described as an antisocial personality type who may have some additional problems but in the whole seems to be responding with some anxiety to the situation of having been caught and charged with a crime which holds a rather strong penalty. I did not find him unable to stand trial nor did I have any evidence to show that he was legally not sane at the time of the commission of the alleged crime.

Regarding the diagnosis of Herring as having an antisocial personality, Dr. Friedenberg stated antisocial personality is a recognized form of mental illness that, at the time of the deposition, was not very amenable to treatment. Dr. Friedenberg described the antisocial personality as guiltless, highly aggressive,

22

impulsive, highly sensitive to social criticism, untruthful when it serves the individual's purposes, unable to profit from experience, and having its own sense of morality (coinciding very little with society's sense of morality). Dr. Friedenberg further stated Herring did "not suffer from psychosis or anything that could be considered a gross disturbance of emotional functioning."  As for Herring's remorse, Dr. Friedenberg stated: "I think his remorse as far as the one crime that he did admit to was primarily based on the fact that he was caught."

The defense decided not to use Dr. Friedenberg at trial.  The State, however, understandably tried to present testimony from Dr. Friedenberg.  The State's proffer was that Dr. Friedenberg had made the following determination:  "[T]hat the Defendant's personality and character is antisocial.  And that he has sufficient and normal intelligence to understand and appreciate his criminal conduct and so forth, in this particular case."  The defense objected to the admission of testimony from Dr. Friedenberg, contending, *inter alia*, that the State's use of his testimony was barred under the rule pursuant to which Dr. Friedenberg's evaluation had been obtained by the defense.  The trial judge concluded Dr. Friedenberg could not be used as a prosecution witness.

The fact and nature of Dr. Friedenberg's evaluation support the following conclusions. First, Herring's allegation that counsel did not perform an investigation is unsupported. In his brief, Herring contends:

> Quarles did not follow up on [the St. Luke's] reports [in his possession] to understand what they meant and did not obtain the testimony of a mental health expert, who could have competently explained the meaning of an I.Q. test to the jury and could have testified about Herring's mental retardation and brain damage.

This contention simply is not supported by the record. Quarles did consult an expert. Second, the record supports an inference that the case Quarles put on was the product of a tactical decision made after investigation. Quarles knew the substance of Dr. Friedenberg's conclusions and decided to keep the evaluation and Dr. Friedenberg's opinions out of evidence—in fact, he fought to keep Dr. Friedenberg from testifying before the jury. Finally, there was no prejudice to Herring due to Quarles' conduct.

We consider next Herring's claim that his counsel should have investigated his background and presented additional character witnesses. In rejecting this claim, the state trial court stated much of the testimony proffered by Herring was dated and of doubtful value. The state trial court concluded that, given Herring's history of drug involvement and other robberies, as well as counsel's dilemma of putting on mitigating evidence without giving the State an opportunity to further

24

damage the defendant, Quarles' performance was not deficient in presenting the testimony of Herring's mother only. The state trial court further concluded Herring failed to establish prejudice. The state court conclusions have abundant support in the record.

The information as to which at least two of the proffered character witnesses could have testified would have been somewhat dated. Moreover, although one conviction for robbery was admitted into evidence, there were a number of convenience store robberies as to which evidence was not admitted. The other convenience store robberies were discussed by Herring during his taped statements to police. The trial record reflects, however, that other crimes evidence was redacted from the taped statements played for the jury during the guilt phase. In fact, the state trial court judge excluded evidence of other robberies (aside from the one conviction used as a statutory aggravating factor) from the penalty phase due to defense counsel's agreement not to present mitigating testimony as to Herring's lack of a significant history of prior criminal activity.

As for Herring's drug involvement, the record shows Herring himself made statements to a correctional officer regarding his drug activities in New York.

Herring admitted to the correctional officer he had been selling drugs and had been cutting the drugs to make more money.[7]

We turn next to Herring's claim that Quarles was ineffective in failing to introduce reports, including reports from St. Luke's Hospital, regarding Herring's mental condition that were in his possession at the time of trial. The state trial court concluded the reports were not uniformly favorable to Herring, the defense did establish Herring's learning and psychological problems through his mother, and Quarles' failure to introduce the reports into evidence was not a professional deficiency. The state trial court further held Herring failed to establish prejudice. The state court rulings are supported by the record. The reports were dated and were not uniformly favorable to Herring's case. The state court resolution of Herring's claim is further supported by the fact and nature of Dr. Friedenberg's evaluation of Herring.

Upon review of the record before the state courts, the state court resolution of Herring's claims was not contrary to, and did not involve an unreasonable application of, clearly established federal law, and did not result in a decision that was based on an unreasonable determination of the facts.

---

[7] The correctional officer was proffered by the State as a witness to impeach Meyers, but the State withdrew him when it concluded his testimony would not "impeach[] or comment[] on the credibility of a prior witness."

b.      *District Court Decision*

The district court denied Herring's ineffective-assistance-of-counsel claim,

concluding the state court did not reach a decision that was "contrary to, or [that]

involved an unreasonable application of, clearly established Federal law . . . [and

was not] based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  The district court further

stated:

> Petitioner argues that counsel failed to present any evidence in
> mitigation and that he should have obtained documentary evidence
> regarding Petitioner's mental disability and serious emotional
> problems.  Petitioner identifies a report detailing Petitioner's
> psychological and emotional problems while at the Wiltwyck School
> and character witnesses who would have testified on his behalf.
>
> As to issue one, the trial court denied it based on the following:
> 1) at least one of the reports resulted from an interview done when
> Petitioner was 13 years old; 2) Petitioner's counsel was able to
> establish learning disabilities and psychological problems through the
> testimony of Petitioner's mother; 3) one of the reports established that
> Petitioner's mother did not keep Petitioner's appointments with the
> counselor; and 4) the reports reflect that Petitioner was of dull normal
> intelligence.
>
> The record supports the trial court's findings, and the Court
> agrees that Petitioner has not shown that his counsel's performance
> was deficient or that he sustained prejudice.  The Court notes that one
> of the reports resulted from an evaluation performed when Petitioner
> was 12 years old and that another report described Petitioner as
> having "intellectual functioning in the dull normal range."  The latter
> report was based on an evaluation done on January 21, 1974, and

found Petitioner to have full scale IQ of 81. Moreover, Petitioner's mother testified at sentencing that Petitioner was a "hyperactive child diagnosed by the doctor, with very low IQ of 80, learning disability." She also testified that Petitioner was treated for psychological problems as a child.

      . . . .

      Petitioner argues that counsel failed to introduce two psychological reports that diagnosed him as suffering from retardation and other organic neurological disorders. Petitioner identifies two reports from St. Luke's Hospital in New York City, which concern evaluations performed on Petitioner when he was 12 and 13 years old.

      The trial court addressed this issue and found it to be without merit. The trial court noted that counsel did present testimony from Petitioner's mother, which revealed that his home-life was poor; that his parents divorced when he was four years old; that he had psychological problems; that he was hyperactive with a low IQ and a learning disability; and that she loved him. The trial court found that the reports would have been cumulative to the mother's testimony.

      The record supports the trial court's findings, and the Court agrees that Petitioner has not shown that his counsel's performance was deficient or that he sustained prejudice. The Court notes that Petitioner's mother specifically testified at the penalty phase hearing as to Petitioner's low IQ and learning disabilities and as to Petitioner's poor home-life. The report would have been cumulative to her testimony. The Court also notes that one of the reports actually suggests that Petitioner had normal intellectual abilities: "There is also a discrepancy between Ted's intellectual abilities, *albeit at a Dull-Normal range*, and his actual achievement."

(citations omitted).

Although the district court did not hold a hearing on Herring's ineffective-assistance-of-counsel claim, such treatment of a claim is appropriate where, as here, "a hearing would not assist in the resolution of [petitioner's] claim[s]." *Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir.) (citation omitted), *reh'g and reh'g en banc denied*, 48 Fed. Appx. 329 (11th Cir. 2002), *cert. denied*, 537 U.S. 1204, 123 S. Ct. 1278, *reh'g denied*, 538 U.S. 995, 123 S. Ct. 1825 (2003).

Applying the deferential § 2254 standard of review, the district court correctly affirmed the state court decisions. As set out in Part II.C.1.a. above, the state court decisions were supported by the record before those courts. We further note the district court had before it not only the record that was before the state courts in resolving these issues, but also the record of additional post-conviction proceedings in this case. Nothing in the record of these additional post-conviction proceedings undermines the state court decisions.

Most notably, the post-conviction record includes a December 1991 deposition of Quarles that was taken by Herring's current counsel during proceedings on Herring's claim that Pearl had acted at trial under an impermissible conflict of interest. In his deposition, Quarles stated his theory originally was to get Herring to plead guilty. He said the trial judge had indicated that if Herring

29

pled guilty, he would receive a life sentence. (In his own December 1992 deposition, Pearl testified that he had a similar recollection.) When Herring refused to plead guilty, Quarles' tactic was to try to convince the jury that Herring was young and ignorant.

In terms of investigation, Quarles stated that he talked to Herring about "possible witnesses, events in his life, relatives." Quarles also testified that he had Herring examined and "a report was produced." He testified that he did not know how to get the childhood reports regarding Herring's mental condition admitted: "I made some attempt to talk to a doctor or two that had examined him and either I couldn't locate them or they had other information or they had other testimony that was detrimental to call as a witness." When questioned specifically about a report from St. Luke's Hospital, Quarles further stated:

> I can't specifically say what I did or if I was able to locate the doctor. I do know that I attempted to locate some doctors, could not—was unsuccessful as to one or two or one. It seems to me there was some doctor somewhere, maybe here, that was definitely going to throw in Mr. Herring despite this and this and this, Mr. Herring [k]new exactly what he was doing and Mr. Herring intended to kill Mr. Heolzelg [sic].

With respect to investigating and presenting character witnesses, Quarles stated that, through his discussions with Herring and Meyers, he concluded there

30

was no one who could attend the trial who might be a good character witness on Herring's behalf.

Again, the state court rulings were sustainable on the record that was before the state courts in ruling on Herring's claims. Moreover, the additional post-conviction record before the district court does nothing to undermine those rulings. We affirm the district court's denial of Herring's claims.

2. *Quarles' failure to contest the heightened premeditation aggravating circumstance*

Herring next contends Quarles' performance was deficient in that he did not object to the applicability of the heightened premeditation aggravating circumstance. Counsel's performance cannot be deemed to have been deficient because, at the time of Appellant's sentencing, the aggravator was interpreted to cover Appellant's case. In fact, the Florida Supreme Court initially affirmed the application of the aggravator to Appellant's case. Moreover, as to the prejudice prong, the Florida Supreme Court subsequently eliminated the aggravator from Herring's case, but nevertheless affirmed the death sentence.

3. *Quarles' failure to object to the avoidance of arrest jury instruction*

Herring contends Quarles was ineffective in that he did not object to the avoidance of arrest instruction. Herring asserts the trial court's instruction was

31

erroneous in two respects: (1) the instruction did not advise the jury that it could find the aggravator only if it concluded beyond a reasonable doubt that eliminating a witness was the dominant or sole motive of the killing; and (2) the instruction did not advise the jury that, under Florida law, the uncorroborated testimony of a single witness may be insufficient to support a finding of an aggravator.

The State contends, as the district court concluded, that Herring's claim is procedurally barred because he never raised it in state court. Herring did not address the district court's finding of procedural bar in his initial brief. In his reply brief, Herring contends he raised the claim in his first 3.850 Motion at ¶ 94. Again, "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) (citation omitted); *see also United States v. Whitesell*, 314 F.3d 1251, 1256 (11th Cir. 2002), *cert. denied*, 539 U.S. 951, 123 S. Ct. 2628 (2003); *United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999); *United States v. Martinez*, 83 F.3d 371, 377 n.6 (11th Cir. 1996). Although Herring's failure to present argument in his initial brief is determinative, we nevertheless briefly discuss the procedural bar argument Herring raises in his reply brief.

In ¶ 94 of his first 3.850 motion, Herring stated:

As discussed *supra* at paragraphs 23 through 48, the cases construing the heightened premeditation and avoidance of arrest aggravating circumstances demonstrate quite clearly that neither of these aggravating circumstances was applicable to this case. Despite the substantial body of case law favorable to petitioner's position, his counsel never contested the applicability of the heightened premeditation aggravating circumstance and made at most a feeble attempt to rebut the applicability of the avoidance of arrest aggravating circumstance. Counsel's failure seriously prejudiced petitioner's sentencing hearing, thereby undermining the fairness of the proceeding.

This statement does not amount to an argument that Quarles was ineffective for not objecting to the avoidance of arrest instruction.

In summary, we reject Herring's claim. The district court found Herring's claim to be procedurally barred. Herring did not address procedural bar in his initial brief. Even if he had properly presented his procedural bar argument, we would have rejected it.

4. *Quarles' failure to object to the cross-examination of Meyers*

Herring next argues that, through its cross-examination of his mother, Dorothy Meyers, the State improperly introduced evidence of a non-statutory aggravating circumstance. He states: "Although it is state law that precludes the admission of a non-statutory aggravating circumstance . . . trial counsel's failure to prevent the admission of this evidence constitutes ineffective assistance of counsel, which is a constitutional issue."

During the penalty phase of Herring's trial, Quarles presented testimony from Meyers that Herring at some point had moved to Florida:

> Q. When did Ted leave your home?
> A. Do you mean for Florida or coming down here or . . .
> Q. For Florida?
> A. Or for the different schools I put him in?
> Q. Florida.
> A. About a year and a half or almost close to two years.

On cross-examination, the State conducted the following questioning of Meyers:

> Q. Mrs. Myers, have you ever had an occasion to talk with a Mr. James B. Brock?
> A. I might have. I don't recall the name.
> Q. He's a Correctional Probation officer in the State of Florida. Does that help?
> A. I believe so.
> Q. Did you tell Mr. Brock that the reason you sent your son to Florida, was because your son had become involved in some drug dealings in New York City, and it was necessary for him to get away from New York City quickly, that the word was out that people involved, who were supplying your son with drugs, were out to get him?
> A. I didn't say [Pause] of those words, no. I said that he went to the police and testified about some drugs. I don't know what he might have put down there.
> Q. You never told anybody the reason he left New York was because he was involved—
> A. Well, his life was in danger because, if he would testify against the drug dealers, his life was in danger.
> Q. Did he ever testify?
> A. No. Because I sent him here.
> Q. But, it is your testimony that you indicated to the correctional officer that this involved testimony?

34

A. Well, let's put it this way. I didn't know if—It never got to trial. He went to the police and informed the police about it.

Q. Did you tell that to the correctional officer?

A. I might have.

Q. Is it possible that you didn't?

A. I really don't remember.

Q. Do you recall telling the correctional officer, Mr. Brock, that your son got involved over his head with drug suppliers and they were blaming him for the missing drugs?

A. I don't remember.

Herring contends this cross-examination was improper and Quarles was ineffective in that he failed to object to it.

In rejecting Herring's claim, the state court concluded:

> Yet the door was opened to this cross because on direct the mother testified she sent him to Florida about two years ago. The State had the right and duty to ask why he was sent to Florida. A defense objection to this line of questioning would have been overruled.

The Florida Supreme Court agreed with the trial court's findings and affirmed its decision. The district court agreed, holding Quarles' representation was not deficient and Herring had not shown prejudice.

The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had Quarles done what Herring argues he should have done—objected to the State's cross-examination of Meyers. It is a "fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters." *Agan v.*

35

*Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997) (citations omitted).  Accordingly,

with regard to this claim, we hold Herring cannot establish either deficient

performance by Quarles or prejudice.[8]  We therefore reject Herring's argument

that Quarles was ineffective in failing to object to the State's cross-examination of

Meyers.

D.     *Conflict of Interest*

The final issue before the Court is Herring's contention that, at the time of

trial, Howard Pearl had an impermissible conflict of interest due to the fact that he

held the status of special deputy sheriff so he could carry a firearm.  In his brief,

Herring contends Pearl's "need to carry a concealed weapon, dependent as it was

upon maintaining the favor of law enforcement in general and the Marion County

Sheriff in particular, who could revoke that privilege at will, is precisely the type

of personal interest that may create a conflict as contemplated by the Sixth

Amendment."  Herring argues that, as a result of this conflict, Pearl failed to

contest the credibility of the law enforcement officers, in fact bolstered their

credibility during closing argument, and chose an unreasonable trial strategy that

---

[8] Although we will grant relief if application of a state law violates a specific federal
constitutional right or if a state trial judge's erroneous admission of evidence makes a petitioner's
trial "so fundamentally unfair that the conviction was obtained in violation of the due process
clause of the fourteenth amendment," *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991)
(citations omitted), neither circumstance is present in this case.

did not require him to challenge the officers. The state court held hearings on this issue and denied Herring's claim on the merits.

After conducting an evidentiary hearing, the state trial judge made the following findings:

> Howard Pearl applied to become a special deputy sheriff in Marion County in 1970. He sought to obtain this status in order to have the authority to carry a concealed firearm throughout the State of Florida "for protection of self and family." The sheriff of Marion County in 1970, Doug Willis, apparently granted Mr. Pearl the status of special deputy sheriff for the purposes of carrying a concealed firearm. . . . Sheriff Moreland testified that he continued Mr. Pearl's status as a professional courtesy and that this was a common practice at that time to continue the status of prominent members of the community.

> Although Mr. Pearl was required to maintain liability insurance by the Marion County Sheriff's Department through the Florida Sheriff's Self-Insurance Fund, he had no criminal law enforcement authority or duties and was considered as an unpaid medium hazard special deputy sheriff . . . .

> Despite the fact that Mr. Pearl's identification card issued by the Marion County Sheriff's Department stated that he was "a regularly constituted deputy sheriff," this Court finds that the testimony of Mr. Pearl and Sheriff Moreland, at the evidentiary hearing, clearly shows that Mr. Pearl's status was an honorary appointment. Specifically, Mr. Pearl (1) was never certified as a law enforcement officer; (2) never received any compensation from or executed any employee tax forms from the Marion County Sheriff's Department; (3) received no law enforcement training from the Marion County Sheriff's Department; (4) was never issued a uniform, vehicle or any other equipment from the Marion County Sheriff's Department; (5) never made and never [was] given the authority to

make any arrests, stops or any other duties as a deputy sheriff of the Marion County Sheriff's Department; (6) never reported to any roll calls at the Marion County Sheriff's Department; (7) was never on a duty roster for the Marion County Sheriff's Department; (8) was never copied on any internal memoranda from the Marion County Sheriff's Department, other than insurance renewal notices; (9) never was asked to act in any way for the Marion County Sheriff's Department; and (10) never held himself out as a regularly constituted deputy sheriff of the Marion County Sheriff's Department. In fact, Sheriff Moreland testified that Mr. Pearl's status was "honorary" in nature and was solely for the purposes of Mr. Pearl being able to carry a concealed firearm.

In addition, James P. Gibson, the Public Defender for the Seventh Judicial Circuit at present and at the time of Mr. Pearl's representation of the Defendant, testified that he knew of Mr. Pearl's status as a special deputy sheriff and that status was honorary and only for the purpose of carrying a concealed firearm. . . . Further, Mr. Gibson testified that Mr. Pearl never failed to act responsibly to his clients due to this status and that he never questioned Mr. Pearl's integrity or ability in representing clients because of this special deputy status.

Accordingly, this Court finds as a matter of fact that Mr. Pearl never was and never has been a law enforcement officer of the Marion County Sheriff's Department. Essentially, Mr. Pearl was granted a concealed firearms permit by the Marion County Sheriff's Department in the same manner that many other individuals received during that time period. Contrary to defense counsels' assertions, this Court determines that Mr. Pearl had no actual or apparent authority to act as "a regularly constituted deputy sheriff" for the Marion County Sheriff's Department because at no time did he indicate to anyone that he possessed anything other than a "gun toter's permit" as a result of his special deputy status. . . .

Defense counsel interpreted Mr. Pearl's alleged ineffective cross-examinations and alleged bolstering of law enforcement officers as

38

the adverse effect of his conflict of interest. However, defense counsel presented no evidence or testimony that demonstrated that Mr. Pearl was actively representing conflicting interests. Therefore, this Court finds that the Defendant and his counsel failed to demonstrate that any actual conflict of interest existed between Mr. Pearl and the Defendant resulting from Mr. Pearl's special deputy status.

*Herring v. State*, 730 So. 2d 1264, 1267–68 (Fla. 1998) (alteration in original) (quoting trial court's decision). The Florida Supreme Court affirmed, concluding Herring failed to establish that Pearl labored under an actual conflict of interest, and further stating: "The record reveals no evidence suggesting that Herring's interests were impaired or compromised as a result of Pearl's special deputy status." *Id.* at 1268. Applying the § 2254 standard of review, the district court denied relief.

In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708 (1980), the Supreme Court considered a claim of ineffective assistance of counsel in a case where defense counsel represented three codefendants without objection. *Id.* at 337–38, 100 S. Ct. at 1712. The Court held: "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S. Ct. at 1718. Subsequently, in *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237 (2002), the Supreme Court rephrased the analysis somewhat and stated an

39

"actual conflict" is what a defendant must establish under *Cuyler* to prove a Sixth Amendment violation. *Id.* at 171, 172 n.5, 122 S. Ct. at 1243, 1244 n.5. The Court defined an actual conflict as (1) a conflict of interest that (2) adversely affected his lawyer's performance. *Id.*

Herring does not take issue with the individual state court findings so much as he contends the state courts unreasonably applied *Cuyler* by "exclusively relying on Pearl's status as a law enforcement officer, and refusing to consider evidence of Pearl's [deficient] performance at trial." Herring argues that under *Cuyler* the issue of whether there was a conflict cannot be divorced from the issue of counsel's performance. The case on which Herring primarily relies is *Neelley v. Nagle*, 138 F.3d 917 (11th Cir. 1998), *abrogation on other grounds recognized by Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001). The petitioner in *Neelley* alleged her attorney suffered from an impermissible conflict of interest where the attorney signed a book deal with petitioner three months after trial and the filing of a motion for a new trial. We concluded that where counsel had competently represented petitioner's interests and no others at trial, it was "not unreasonable for the Alabama Court of Criminal Appeals to find only the existence of a potential conflict of interest, rather than an actual conflict." *Id.* at 926. Contrary to Herring's apparent suggestion, we do not read *Neelley* as eliminating the need

40

for there to be a conflict of interest in the first place. If we were to focus only on the quality of Pearl's trial performance, our analysis would be bound by *Strickland*, not *Cuyler*.

In *Quince v. Crosby*, 360 F.3d 1259 (11th Cir.), *reh'g and reh'g en banc denied*, 104 Fed. Appx. 154 (11th Cir.), *cert. denied*, ___ U.S. ___, 125 S. Ct. 436 (2004), we considered a conflict-of-interest claim by another defendant who had been represented by Pearl. In that case, the state trial court and the district court made findings very similar to those made in the case before us. For example, the state trial court made the following findings:

> Mr. Pearl never was and never has been a law enforcement officer with the Marion County Sheriff's Department. Mr. Pearl was in essence granted a concealed weapons permit from the Marion County's Sheriff's Department as many other individuals were at that time. Counter to the defense counsel's assertions, the Court determines from the facts presented that Mr. Pearl had no manifest or actual authority to act as a fully constituted Deputy [S]heriff for the Marion County Sheriff's Department because at no time did he indicate to anyone that he possessed anything other than a "gun toter's permit" as a result of his special deputy status.

*Id.* at 1264 (quoting state trial court findings). Moreover, the district court in *Quince* found:

> [T]he uncontroverted testimony was that Mr. Pearl obtained and maintained his special deputy status solely in order to be able to carry a firearm while traveling throughout the state. He had no law enforcement duties, no arrest powers, and no uniform; he received no

41

law enforcement training, no compensation, and no internal memoranda from the Sheriff's Office. The title was merely honorary. Once state law changed to permit Mr. Pearl to obtain a state license to carry a concealed firearm, he resigned his special deputy position.

*Id.* (quoting district court findings). We concluded in *Quince* there was no conflict. *Id.* at 1264. We reach the same conclusion here.

Given the presumption of correctness attached to the state court factual findings, 28 U.S.C. § 2254(e), and our recent decision in *Quince* considering the very same alleged conflict of interest raised in this case, we cannot say the Florida Supreme Court unreasonably applied *Cuyler v. Sullivan.* On these bases, we affirm the district court's denial of the petition on this ground.

### III. CONCLUSION

We hold Herring's claim under *Clemons v. Mississippi* is without merit. We further hold Herring's claim that he received ineffective assistance of counsel at sentencing to be without merit. Finally, we hold the state court did not unreasonably apply *Cuyler v. Sullivan* to Herring's claim that Pearl suffered from an impermissible conflict of interest due to his status as a special deputy sheriff.

AFFIRMED.